1  **KAZEROUNI LAW GROUP, APC**
2  Abbas Kazerounian, Esq. (SBN: 249203)
   ak@kazlg.com
   Mona Amini, Esq. (SBN: 296829)
3  mona@kazlg.com
4  245 Fischer Avenue, Unit D1
   Costa Mesa, California 92626
5  Telephone: (800) 400-6808
   Facsimile:  (800) 520-5523

6  **LEVIN PAPANTONIO RAFFERTY**
7  Kimberly Lambert Adams
   kadams@levinlaw.com
   316 S. Bavien Street, Suite 600
8  Pensacola, FL 32502
9  Telephone: (850) 435-7056
   *pro hac vice application forthcoming*

10
   *Attorneys for Plaintiff,*
11 *JANE DOE*

12           **UNITED STATES DISTRICT COURT**

13           **CENTRAL DISTRICT OF CALIFORNIA**

14 JANE DOE, on behalf of herself and all      | Case No.:
   others similarly situated,
15                                              | **CLASS ACTION COMPLAINT FOR:**
16                       Plaintiff,             |
                                                |   **I. BENEFITING FROM A SEX**
17        vs.                                   |      **TRAFFICKING VENTURE,**
                                                |      **18 U.S.C. §§ 1591 and 1595;**
18 WebGroup Czech Republic, as; WGCZ           |  **II. RECEIPT AND DISTRIBUTION**
   Holding, as; WGCZ Limited, sro; NKL         |      **OF CHILD PORNOGRAPHY,**
19 Associates sro; Traffic F, sro; GTFlix TV,  |      **18 U.S.C. §§ 2252 and 2252A;**
   sro; FTCP, sro; VS Media, Inc.; HC          | **III. RECEIPT AND DISTRIBUTION**
20 Media, sro; HC Multimedia LLC; FBP          |      **OF CHILD PORNOGRAPHY,**
   Media sro; Serverstack, Inc., Digital Ocean |      **18 U.S.C. § 2260;**
21 Holdings, Inc.; and Digital Ocean, LLC      |  **IV. VIOLATION OF DUTY TO**
   f/k/a/ Digital Ocean, Inc.; STEPHANE        |      **REPORT CHILD SEXUAL**
22 MICHAEL PACAUD; DEBORAH                     |      **ABUSE MATERIAL, 18 U.S.C.**
   MALORIE PACAUD                              |      **§ 2258A;**
23                                             |   **V. VIOLATION OF CALIFORNIA'S**
                       Defendants.             |      **UNFAIR COMPETITION LAW**
24                                             |      **("UCL"), CAL. BUS. & PROF.**
                                               |      **CODE §§ 17200, ET SEQ.**
25
                                               | **JURY TRIAL DEMANDED**
26

27

28

**INTRODUCTION**

1.     Plaintiff and the proposed class are victims and survivors of childhood sex trafficking who had videos and images of their childhood sex trafficking sold and/or distributed on websites owned, operated, managed and controlled by Defendants. Defendants have exploited this child sexual abuse material for profit.

2.     The Defendants, on their websites, created, organized, and disseminated images and videos that depict child sexual abuse, often referred to as child pornography. Each of these images and videos are crime scenes the Defendants monetized.

3.     The Plaintiff brings this action against the Defendants, who financially benefited from, or otherwise participated in, a sex trafficking venture in which the Plaintiff was a victim.  Plaintiff, who was under eighteen years of age at the time of filming, was depicted in commercial sex acts and child pornography, which was then made available for viewing on websites owned or operated by the Defendants.  This violated, among other laws, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 and 1595.

**JURISDICTION AND VENUE**

4.     The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

5.     The Court may properly exercise personal jurisdiction over all Defendants.  Each of the Defendants maintains minimum contacts with California, such that maintaining this lawsuit does not offend traditional notions of fair play and substantial justice.

6.     These contacts include, but are not limited to, one or more of the Defendants' ownership and control of Penthouse World Media LLC; Penthouse World Broadcasting LLC; Penthouse World Digital LLC; Penthouse World Licensing LLC; and Penthouse World Publishing LLC (the Penthouse entities),

CLASS ACTION COMPLAINT

1   located at 8944 Mason Ave, Chatsworth, California 91311. The manager/member
2   listed for the Penthouse entities, Robert Seifert, is a WebGroup Czech Republic, as
3   executive.

4        7.      Additionally, on information and belief, one or more of the Defendants
5   owns and controls Defendant VS Media, Inc., located at 31416 Agoura Rd, Westlake
6   Village, CA 91361. VS Media, Inc. manages the XVideos webcam model platform
7   from their California headquarters.[1]   In this regard, XVideos directs all those
8   interested in becoming an "XVideos webcam model" to the California VS Media
9   team stating, "Once you click submit, a member of our Los Angeles-based staff will
10  contact you to help you complete the setup process for new live cam models."[2]
11  Defendants invite anyone with questions to reach out to the XVideos "broadcast
12  support team at broadcastsupport@vsmedia.com."

13       8.      Additionally, upon information and belief, VS Media, Inc. provides
14  technology and support foundational to WebGroup Czech Republic, as and related
15  entities' business activities across multiple websites and platforms that it owns and
16  controls.

17       9.      Consequently, these activities in California are continuous and
18  systematic. Defendants have purposefully availed themselves of this Court's
19  jurisdiction. Defendants direct substantial business activity into this jurisdiction.
20  There is a substantial nexus between Jane Doe's claims and Defendants' activities.

21       10.     As set forth in more detail below, each of the Defendants acts as the alter
22  ego of the others.

23       11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18
24  U.S.C. § 2255(c)  because a substantial part of the events or omissions giving rise to
25  the claims asserted in this action occurred in the judicial district where this action is
26  brought.

27  _____

28  [1] *See* https://www.xvideos-cams.com/broadcasters.php?tracker=xv_info_external.
    [2] *Id.*

**PARTIES**

12.     Plaintiff JANE DOE is an individual who is now the age of majority under California law and presently resides in California.  The Plaintiff is a victim of child sex trafficking and the creation of child pornography under applicable law.  She is also a courageous survivor willing to step forward and tell her story in the interests of justice and out of concern for other survivors.

13.     Due to the sensitive, private nature of Plaintiff's allegations, and the potential for harmful retaliation against her, Plaintiff requests this Court permit her to proceed under a pseudonym.  Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature.  For good cause, as exists here, the Court may permit Plaintiff to proceed in pseudonym to protect her from annoyance, embarrassment, oppression, or undue burden or expense.

14.     Here, Plaintiff would face imminent danger if her identity were known.  Granting pseudonym status is warranted because this litigation will involve the disclosure of identifying information that would allow Plaintiff's former traffickers to locate and harm her.

15.     Additionally, disclosing her identifying information would reveal stigmatizing sexual information, including rape.  Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

16.     Defendants will not be prejudiced by Plaintiff's use of a pseudonym.  Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties are governed by a protective order.  Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal safety, private life, or future employment prospects.

17.     Defendants include a number of intertwined and related entities:

a.      Defendant WebGroup Czech Republic, as (formerly WGCZ, sro and WGCZ, as), with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Marjorie Grocq; Robert Seifert; and formerly by LK Management Limited; Konečná & Zacha, sro, law office , IČ; and Kateřina Pokorná.  WebGroup Czech Republic, as owns the XVideos trademarks.

b.      Defendant WGCZ Holding, as, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud, Stephane Pacaud, Marjorie Grocq, and Robert Seifert.

c.      Defendant WGCZ Limited, sro, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Robert Seifert; and WGCZ Holding, as.

d.      Defendant NKL Associates sro, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Marjorie Grocq; Robert Seifert, and formerly LK Management Limited.  NKL Associates sro owns the XNXX trademarks.

e.      Defendant Traffic F, sro, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Robert Seifert; and formerly by LK Management, Limited, and Robert Caroll (American resident, possible U.S. citizen).  Traffic F, sro owns the Traffic Factory trademark, and runs Traffic Factory, Defendants' advertising platform.

f.      Defendant GTFlix TV, sro, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Marjorie Grocq; WGCZ Holding, as; and formerly by Zeus Trade, sro; Danylo Kucherenko; Sofya Koroleva; Web Group Limited; Pedro Javier Vazquez Hernandez; Ing. Šárka Matoušková.   GTFlix, TV, sro owns the Legal Porno

1  trademarks.

2      g.     Defendant FTCP, sro (formerly FLIRT4FREE.cz, sro), with a

3  place of business at Vodičkova 791/41, Nové Město, 110 00 Prague, and owned

4  and/or managed by Helena Luňáková and Miroslav Mrňa, and formerly Online

5  Services LTD.

6      h.     Defendant VS Media, Inc., with a place of business at 31416

7  Agoura Rd #205, Westlake Village, CA 91361-5643, and owned and/or managed by

8  Gregory Louis Clayman and Tony Shyngle.  VS Media, Inc. owns the Flirt4Free

9  trademarks and runs the XVideos webcam website.

10     i.     Defendant HC Media, sro, with a place of business at Vodičkova

11 791/41, Nové Město, 110 00 Prague, and owned and/or managed by Miroslav Mrňa;

12 Ing. Lucie Hrdinová, and HC Multimedia, LLC; and formerly FBP Media sro.

13     j.     Defendant HC Multimedia LLC with a place of business at 401

14 Ryland St Ste 200-A, Reno, NV 89502, and owned and/or managed by Gregory

15 Louis Clayman; VS Media, Inc.; HC Multimedia, LLC.   HC Multimedia LLC

16 attempted to trademark Hidden Cams.

17     k.     Defendant FBP Media sro, with a place of business at Vodičkova

18 791/41, Nové Město, 110 00 Prague, and owned and/or managed by Jan Jaros;

19 Miroslav Mrna; and VS Media, Inc., and formerly by Gregory Louis Clayman.

20     18.    Robert Seifert has over 60 entities associated with him in the Czech

21 business registry, over half of which are at the same address:  Krakovská 1366/25,

22 Nové Město, 110 00 Prague.

23     19.    Defendants WebGroup Czech Republic, as; WGCZ Holding, as; WGCZ

24 Limited, sro; NKL Associates sro; Traffic F, sro; GTFlix TV, sro; FTCP, sro; VS

25 Media, Inc.; HC Media, sro; HC Multimedia LLC; and FBP Media sro (collectively,

26 "WGCZ," "WGCZ entities," or "WGCZ Defendants") commonly engage in a kind of

27 corporate shape-shifting:  altering their names, switching directors around, deleting

28 some corporations and forming others.

KAZEROUNI
LAW GROUP, APC

20.    Defendant Stephane Michael Pacaud is, and at all relevant times was, a shareholder and an executive of Defendant WebGroup Czech Republic, and its corporate affiliations and alter egos. Mr. Pacaud's last known residence listed on the Czech business database for WebGroup Czech is Saint Germain au Mont d'Or, 1 Chemin De La Mendillonne, French Republic

21.    Defendant Deborah Malorie Pacaud is, and at all relevant times was, a shareholder and an executive of Defendant WebGroup Czech Republic, and its corporate affiliations and alter egos. Ms. Pacaud's last known residence listed on the Czech business database for WebGroup Czech is Krakovská 593/19, Nové Město, 110 00 Prague 1.

22.    Thus, each of the WGCZ Defendants acts as the alter ego of the others. The WGCZ entities have a complex corporate structure designed to operate interactive commercial websites, offer memberships, create content, and transact other related business throughout the world and the United States, including specific business contacts with persons in California.

23.    The WGCZ Defendants own and control Xvideos.com, Xnxx.com, Xvideosdaily.com, and Xvideostoday.net, all websites that display and distribute pornographic videos, content, and services.

24.    ServerStack, Inc. is a wholly owned subsidiary of Digital Ocean, Inc., and at all relevant times was, a corporation existing under the laws of Delaware as a Domestic Business, and having its registered agent Corporation Service Company located at 80 State Street, Albany, New York 12207-2543 and its principal place of business at 101 Avenue of the Americas, 10th floor, New York, New York, 10013. ServerStack is doing business in California through its data center located in San Jose, California.

25.    Digital Ocean Holdings, Inc. is, and at all relevant times was, the ultimate parent company of Digital Ocean, LLC and Server Stack, Inc., and is a corporation existing under the laws of Delaware, having a place of business at 101

Avenue of the Americas, 10th floor, New York, New York, 10013, and its registered agent, Corporation Service Company at 80 State Street, Albany, New York 12207. According to its website, Digital Ocean maintains a branch and is doing business in California.

26.     Digital Ocean, LLC, f/k/a Digital Ocean, Inc, is a wholly owned subsidiary of Digital Holdings, Inc. Digital Ocean, Inc., was organized under the laws of Delaware in 2012, having a principal place of business 101 Avenue of the Americas, 10th Floor, New York, New York, 10013, until it was reorganized as Digital Ocean, LLC., a foreign limited liability company, with its registered agent at Corporation Service Company, 80 State Street, Albany, New York 12207. According to its website, Digital Ocean is doing business at its California branch.

27.     Defendants ServerStack, Digital Ocean Holdings, Inc., and Digital Ocean, LLC, f/k/a Digital Ocean, Inc., hereinafter will be collectively referred to as ("Server Defendants").

28.     The Defendants conspired, facilitated, and financially benefited from participating in what they knew or should have known were sex trafficking ventures. In these ventures, Jane Doe and other minors were trafficked and commercially exploited for sex, in violation of law, including but not limited to, the TVPRA, 18 U.S.C. § 1591, *et seq*.

29.     Sex traffickers and the Defendants worked together to earn a profit from commercial sex acts and child pornography involving the Plaintiff and Class members.

30.     In addition to the sex trafficking beneficiary and facilitation claims that are the subject of this lawsuit, the WGCZ Defendants have also engaged in sex trafficking as direct perpetrators, on information and belief, in at least two instances.

31.     On information and belief, WGCZ entity member/manager Miroslav Mrna directs and/or controls a sex trafficking venture involving pornography performers that spans several countries, including the Czech Republic, Romania, and

Colombia.

32.    On information and belief, VS Media, Inc., California-based employees Brad Estes and Jamie Rodriguez are co-conspirators in Miroslav Mrna's sex trafficking venture.

33.    On information and belief, the Legal Porno studio owned and/or controlled by WGCZ entity GTFlix TV, sro has used force, fraud, and coercion against women performers, who were severely injured by the extreme and violent nature of the pornography filming, including one who had to be hospitalized.

## BACKGROUND

34.    In 2000, Congress passed the Trafficking Victims Protection Act ("TVPA"). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses,[3] including sex trafficking of children under the age of 18 and sex trafficking by force, fraud, or coercion.[4]

35.    Congress reauthorized the TVPA in 2003 and created a civil cause of action, codified at 18 U.S.C. § 1595.[5]

36.    The TVPRA permits civil claims against perpetrators and against those who, although not direct perpetrators, knowingly benefit from participating in what they knew or should have known was a sex trafficking venture.[6]

37.    During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity.  It ought to concern every community, because it tears at our social fabric.  It ought to concern every business, because it distorts markets.  It ought to concern every nation, because it endangers public health and

---

[3] See Victims of Trafficking and Violence Protection Act of 2000. Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1467(2000), available at https://www.congress.gov/106/plaws/publ386/PLAW-106publ386.pdf.
[4] See 18 U.S.C. § 1591(a) available at https://www.law.cornell.edu/uscode/text/18/1591
[5] See Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003), available at https://www.gpo.gov/fdsys/pkg/STATUTE-117/pdf/STATUTE-117-Pg2875.pdf
[6] Id.

fuels violence and organized crime."[7]

38.     Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[8]

39.     The United States Department of Justice estimates that pornographers have recorded the abuse of more than one million children in the United States.[9] The Internet has radically changed how child pornography is reproduced and disseminated:  "The expansion of the Internet has led to an explosion in the market for child pornography, making it easier to create, access, and distribute these images of abuse. While 'child pornography' is the term commonly used by lawmakers, prosecutors, investigators and the public to describe this form of sexual exploitation of children, that term largely fails to describe the true horror that is faced by hundreds of thousands of children every year. The child victims are first sexually assaulted in order to produce the vile, and often violent, images. They are then victimized again when these images of their sexual assault are traded over the Internet in massive numbers by like-minded people across the globe."[10]

40.     In the United States, the National Center for Missing and Exploited Children ("NCMEC") serves as the national clearinghouse for child pornography/child sexual abuse material reports.  NCMEC was created by an Act of Congress and is federally funded.  NCMEC operates the "CyberTipline," which gathers child sexual exploitation reports (including child pornography, online

---

[7] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), available at https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[8] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, available at https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

[9] Roger J.R. Levesque, Sexual Abuse of Children: A Human Rights Perspective, at 66 (Ind. Univ. Press 1999).

[10] https://www.justice.gov/psc/docs/natstrategyreport.pdf.

enticement, and contact offenses). Individuals and electronic service providers ("ESPs") may report incidents of suspected child sex trafficking or child sexual abuse images to the CyberTipline. In 2019, the CyberTipline processed 16.9 million reports and approximately 21 million reports in 2020. NCMEC also operates the U.S. Child Victim Identification Program and, as of 2019, it had reviewed more than 312 million images and videos of child sexual abuse material.[11]

41.   Through NCMEC's database, more than 13,200 child victims have been identified by law enforcement.

42.   On January 31, 2020, President Trump entered Executive Order #13903, entitled "Combating Human Trafficking and Online Child Exploitation in the United States."[12] The Order stated: "Human trafficking is a form of modern slavery. Throughout the United States and around the world, human trafficking tears apart communities, fuels criminal activity, and threatens the national security of the United States. It is estimated that millions of individuals are trafficked around the world each year—including into and within the United States." It further stated: "Twenty-first century technology and the proliferation of the internet and mobile devices have helped facilitate the crime of child sex trafficking and other forms of child exploitation. Consequently, the number of reports to the National Center for Missing and Exploited Children of online photos and videos of children being sexually abused is at record levels."

///

///

///

///

---

[11] Child Sexual Abuse Material (CSAM), National Center for Missing & Exploited Children, https://www.missingkids.org/theissues/csam (last visited Feb. 8, 2021).
[12] Exec. Order No. 13903, 85 FR 6721, 6721-6723 (Jan. 31, 2020), available at https://www.federalregister.gov/documents/2020/02/05/2020-02438/combating-human-trafficking-and-online-child-exploitation-in-the-united-states.

CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

## A. Commercial Sex Acts Involving Minors Are Sex Trafficking

43.     Under 18 U.S.C. § 1591(e)(3) the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

44.     Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value, from participation in a venture which knowingly recruits, entices, harbors, transports, provides, obtains, maintains, advertises, patronizes, or solicits by any means a commercial sex act involving a person who is under 18 years old or a person induced by force, fraud, or coercion.[13]   18 U.S.C. § 1591(a)(1).    Section 1591(a)(2) also makes it a crime to knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the acts described in § 1591(a)(1).

45.     The TVPRA, as amended in 2008, improved a victim's ability to hold traffickers accountable, by eliminating the requirement to prove a particular defendant knew a sex trafficking victim was a minor, in cases where the defendant had a reasonable opportunity to observe the minor.  The TVPRA also significantly expanded the civil cause of action and extended liability to those who financially benefit from sex trafficking. The revised civil remedy provision allows sex trafficking survivors sue anyone who benefits financially or receives anything of value from the violation. Survivors may sue the direct perpetrator *as well as anyone else* who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of [the statute.]"  18 U.S.C. § 1595(a) (emphasis added).

46.     In 2018, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively,

---

[13] Except for advertising offenses, "reckless disregard of the fact[s]" is a sufficient mens rea for any of these crimes. 18 U.S.C. § 1591(a).

CLASS ACTION COMPLAINT

"FOSTA/SESTA") to amend 47 U.S.C. § 230, the Communications Decency Act, to clarify that it was never intended to provide immunity from civil lawsuits for websites that facilitate or profit from sex trafficking.[14]     The FOSTA/SESTA amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment."[15]

47.    Plaintiff and the Class Members are  sex trafficking victims under 18 U.S.C. §1591 and are therefore entitled to bring a civil action  and seek redress under 18 U.S.C. §1595.

**B. WGCZ Entities Facilitate and Profit from Sex Trafficking of Minors**

48.    The WGCZ Defendants own and operate a large number of websites including two major "tube-sites" -- www.XVideos.com ("XVideos") and www.xnxx.com ("XNXX") -- which WGCZ Defendants boast are "the most visited adult porn tubes on the planet."[16]

49.    WGCZ boasts it has  200 million daily visitors and 6 billion daily impressions on its various websites from which it has consolidated production and distribution.[17] Traffic Factory is a web advertising and digital marketing company created by WGCZ, and owned by Traffic F, sro, for use on XVideos and other WGCZ-owned sites.  WGCZ's revenue model is based in part on being able to sell ads to advertisers.

50.    Unlike other video websites such as YouTube, WGCZ's websites also include a download button for transferring images and videos, including the child sexual abuse material appearing on the WGCZ Defendants' websites, from their servers to an undisclosed number of child pornographers, child sex traffickers, and pedophiles.

---

[14] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253
[15] See, 132 Stat. 1253, §4(b); see also Woodhull Freedom Found v. United States, No. 18-5298, 2020 WL 398625 (D.C. Cir., June 24, 2020).
[16] https://porn.work/en/ (last visited Feb. 21, 2021).
[17] See https://www.trafficfactory.com/wp-content/uploads/2019/09/TRAFFIC-FACTORY-MEDIA-KIT-ENGLISH.pdf

51.    WGCZ proclaims XVideos to be its flagship website.

52.    As of January 2021, Xvideos is the most popular pornography website in the world and the 7th most popular website in the world, visted more than Netflix, Amazon, and Wikipedia,[18] with over 3 billion visits a month.[19] WGCZ's second most popular website XNXX is the 9th most visited website in the world and together these two websites garner over 5 billion visits a month,[20] double the traffic of their biggest competitor, Pornhub.[21]

53.    WGCZ receives between 1200 to 2000 videos to its site every day.

54.    WGCZ permits easy access to its XVideos site and encourages users to create their own sites and use the existing 7,000,000 videos with video URL, thumbnail URL, tags, duration, title, and embedded code to do so.[22] As recently as 2018, WGCZ invited Xvideos users taking  advantage of this feature to subscribe to their "updates feed" so that new videos could be quickly distributed from the Xvideos site directly to the subscriber noting, "There are over 5000 videos added every day. It can go up to 10000 videos uploaded in a single day."

55.    Users consuming content on XVideos have several options:  (1) access the site for free without creating an account; (2) create an account and receive a variety of WGCZ developed, generated and controlled benefits or partner programs; (3) pay for a premium Red Service account, which is managed, operated and controlled by WGCZ.

---

[18] *See* https://www.similarweb.com/top-websites/.
[19] *See* https://www.similarweb.com/website/xvideos.com/.
[20] *See* https://www.similarweb.com/website/xnxx.com/.
[21] *See* https://www.similarweb.com/website/pornhub.com/#overview.
[22] https://info.xvideos.com/db

56.     There are three options available for users uploading content, (1) create an account and upload content without making any money (2) create an account and "verify" (upload a video of yourself) to upload videos while disguised behind a VPN and (3) upgrade to a "channel" (upload three high quality videos of a certain length) account to monetize videos.

57.     The content partner program offers the pornographer various methods to upload content and create revenue based on views of material uploaded to XVideos. From the XVideos site, a user can select the WGCZ-created link for "RED videos," XVideos premium content, and various "channels" hosting WGCZ-controlled content, including from content partners.

58.     To join the content partner program a user must create an XVideos account (which requires only a valid email address), "verify" the account, and then set up a "channel" by uploading three or more videos.[23] The "verification" process consists of  submitting a video in which "You do not necessarily have to show your face but it must be enough of you to prove that the content under your account is clearly yours. . . . The video must also be related to XVIDEOS in some way. You can

---

[23] See https://info.xvideos.com/cpp.

CLASS ACTION COMPLAINT

1   have XVIDEOS written on your body, or you can talk about XVIDEOS (a simple "I

2   am on XVIDEOS" is fine). . . . Feel free to be creative. We are not strict on what we

3   want to see, as long as it matches your uploads. We like good ones and may promote

4   them to the  front page."



14       59.    For studios/production companies, the "verification" standard is even

15   lower. WGCZ's site currently instructs them to either "ignore the verification

16   process" or "call us directly."[24]



[24] Although the verification screenshot above shows information dated from 2018, it still appears on
the XVideos account dashboard as a current set of requirements.

CLASS ACTION COMPLAINT

60.     Accounts can be opened by loading a photo or by uploading a video, but there are no requirements that a photo or video must have any relationship to the videos or images being uploaded, which often involve more than one person. Submitting a photo will verify an account and allows submission of a verification video, which opens the door to additional benefits including monetization through either a model account or a channel account.

61.     There is a stated requirement that the account holder be at least 18 years old, but however, it is unclear how this requirement is verified.

62.     Once an account is verified videos may be uploaded. If a video posted by an amateur pornographer includes other parties or individuals, WGCZ has no effective process to verify age.   A user who creates a channel on XVideos can "promote [their] brand through various ads and links"[25] and their videos can be monetized.[26] WGCZ promotes and   profits from these partner channels including verified partner channels that distributed Plaintiff's abuse videos.

63.     WGCZ reviews, monitors, and approves incoming videos to determine whether the videos are worthy of being posted to channel accounts.   Channel accounts require a minimum of three video uploads.  Further, WGCZ reviews videos to confirm whether the video is of "decent quality" defined as "no close ups, bad lighting or shaking camera" and of adequate length such that each of the three required videos for a channel account must be "longer than five minutes."[27]  WGCZ reviews videos and cautions that "if you are stealing content, please don't bother. We will verify."

64.     Content consumers who achieve or otherwise obtain a particular status are offered a variety of benefits by WGCZ, including "dedicated support services."

---

[25] See https://info.xvideos.com/cpp.
[26] See https://info.xvideos.com/account-status.
[27] *See*, https://info.xvideos.com/cpp.

CLASS ACTION COMPLAINT

65. XVideos accounts permit and encourage subscription and premium content placement whereby WGCZ profits from images and videos of commercial sex acts, including the sexual abuse and rape of children. Further, WGCZ encourages advertising placement before videos play, underneath videos and around videos. This profit-making activity included the Plaintiff's rape.

66. WGCZ generates, originates, or otherwise edits video thumbnails and/or tags associated with videos loaded onto its website. Tags are keywords associated with a video and are used to optimize search features on the XVideos website, which ultimately increases views, downloads, and the success of targeted advertising by Traffic Factory. Many tags, categories, and search suggestions that have been reviewed, categorized, created and/or edited by WGCZ help users locate the type of video they are searching for, including child pornography, child sex trafficking, or any other child sexual abuse material. One such tag WGCZ used to classify pornographic content on its XVideos website is "toddler." The optimization, logic, tags and/or search terms created by WGCZ further and automatically presents the user with "related searches" like "jailbait," "not 18," "flat hairless," "innocent little young girl," "cheese pizza," "how old is she," "elementary," and more than 20 other "related searches" where videos had been tagged or indexed with similar horrifying terms, some even in foreign languages, suggesting child pornography, trafficking, and rape of children.

67. In short, WGCZ's introduction of "related search terms" and tags make it easier for pedophiles to find the exact content they want: child sexual abuse material, including that of the Plaintiff.

68. WGCZ creates, manipulates and maintains statuses and indexes for account holders, allowing users to locate each other in a verified user index based on information provided at account creation. Uploaders that are monetizing their videos get additional benefits including (1) priority appearance over other users (2) appearance in a "pornstar" index and (3) appearance in an index ranking "models."

KAZEROUNI
LAW GROUP, APC

69.     Another optimizing feature Xvideos performs for its users is creating thumbnail images and preview videos for uploaded videos.  Thumbnail images are preview images that show a particular scene from an uploaded video to a user browsing the site. If a user places their mouse over a video, they are shown additional thumbnail images or a small preview video. Thumbnail images and preview videos are created and displayed to increase traffic to a particular video and generate additional revenue.  Xvideos produces and controls thumbnail images and preview videos for uploaded videos. In some cases, uploaders that are monetizing videos are allowed to select from four Xvideos provided thumbnail images for a limited time after uploading. Xvideos chooses the additional thumbnails and preview videos that appear when users hover over a video.

70.     XVideos users that have "verified" by uploading a video can participate in a XVideos unique chat system and upload videos while disguising their identities through a virtual private network ("VPN").  The Xvideos site is sophisticated enough to determine whether someone entering their site is doing so by VPN as well as whether the IP address or account code was obtained from a server farm or illegitimate  or non-traceable account.

71.     The Xvideos site facilitates and assists pedophiles and criminals to communicate with providers of victims, through its chat system embedded on WGCZ's XVideos website. This unique communication system allows account holders and users to remain virtually anonymous while posting t images and videos without meaningful verification or detection.

72.     The WGCZ communication system combined with the enormous reach and popularity of its website, allowed sex traffickers to market sex trafficking victims, including minors, and connect illegal sex providers and buyers in an anonymous fashion. Because WGCZ controlled the communication system, and allows "verified" users to disguise themselves through a VPN service, the exact location and identities of those who upload videos can be hidden from law

1  enforcement and other agencies responsible for exploited minors.

2       73.    WGCZ makes it easy for traffickers, rapists, or other would-be criminals

3  to go undetected as account holders who control and recover any associated

4  compensation.

5       74.    WGCZ completely fails to control the torrent of videos available on its

6  sites depicting children being molested, rapes of children and adults, persons who are

7  incapacitated and otherwise unwilling participants.

8       75.    Minor victims of sex trafficking and their representatives have contacted

9  WGCZ to remove videos of them from its websites, but  WGCZ has refused to do so.

10  Thus, WGCZ is knowingly in possession of child pornography and is allowing

11  distribution of it for profit.[KA3]

12       76.    As of December 2020, WGCZ, was not registered as an ESP with the

13  National Center on Missing and Exploited Children (NCMEC) to report child

14  pornography and child sex trafficking, on its site(s). Upon information and belief,

15  WGCZ fails to report at least some material it knows is child pornography to

16  NCMEC and/or similar entities and/or law enforcement, even when WGCZ removes

17  such material.

18       77.    WGCZ makes no consistent or effective effort to monitor or control who

19  is posting or present in videos on its websites.

20       78.    Currently, XVideos does not require account owner verification, beyond

21  uploading a video with a reference to Xvideos, unless the account owner seeks to

22  monetize the video.  WGCZ also makes no effort to verify people in the video.  In

23  fact, WGCZ only requires that a video be uploaded with an "Xvideos" sign.

24       79.    Further, the site, acknowledging that account holders are not required to

25  verify the participants in the video, indicates "you might get banned if you upload

26  from multiple accounts" which is impossible to trace because the site allows users to

27  access videos through VPN which hides the true IP address which would have been

28  associated with an account.

CLASS ACTION COMPLAINT

80.    For years, WGCZ has also actively and directly produced content for its various websites and viewers.  WGCZ owns major pornography production studios including the Penthouse entities Private Media Group, Legal Porno, and BangBros.com. [28]



81.    The content WGCZ creates relies on data gathered from its users' habits to highlight new trends, compare viewing habits of users in different cities or regions, and generally parse the online behavior of its millions of consumers.

82.    WGCZ harnesses the data it compiles and analyzes to write scripts and specify details, including dialogue, positions, sex acts, and camera angles in those video shoots. The level of detail and overall approach to WGCZ's content production illustrates the impact of WGCZ's analysis of user data on WGCZ's content creation process. WGCZ caters to fetishes and incorporates and highlights elements of the videos on its websites based on user data. WGCZ's leadership has stressed that content choices reflect the data mining of millions of views, which allows WGCZ to determine what variables produce the highest viewership. WGCZ's data analyses are used to determine, create, and place content, including child sexual abuse material, on its websites.

[28] *See,* http://https://porn.work/en/

CLASS ACTION COMPLAINT

83.   WGCZ also uses data from its billions of monthly views to make decisions about specific features of the content it creates and curates on its various websites. WGCZ suggests to users what other content a particular user might like based on prior viewing, and categorizes all material on its websites, including the child sexual abuse material, based on widely-searched terms. WGCZ leverages its user data to shape the particulars of content and drive user engagement.

84.   WGCZ does not require any verification to create an account and upload videos. WGCZ created a "verification" process that allows users that wish to disguise their locations and IP addresses with a VPN while uploading content to create an account and upload videos by submitting a video with a reference to xvideos in it.

85.   Further, WGCZ indicates that the risk for "uploading illegal content may result in your account being *disabled* and *possibly* deleted."  There is no reference to how long an account would be disabled, when an account would be deleted, nor what measures would be taken to prevent a new account from being created.

86.   WGCZ is responsible, in whole or in part, for developing and creating guidelines which permit, promote, and encourage sex trafficking and child pornography on its website, XVideos.  WGCZ facilitates and assists traffickers and child pornography purchasers through its account creation and data mining efforts. Through the unique systems established by WGCZ, child pornography and videos of rape are organized, tagged, and optimized to create optimal opportunity for profits.

**C.  Server Defendants**

87.   WGCZ partnered with ServerStack to help grow their business by providing growth consulting services and full service infrastructure management services, including indexing and categorizing data and offering sophisticated software designs to maximize XVideos growth and profit.

88.   In 2004, ServerStack, Inc. was created by Ben Uretsky with offices located in New York.

89.   ServerStack does business through its data center in San Jose, California.

90.     At least by 2008, ServerStack became a server host provider for XVideos and its affiliates and as of 2010 became the sole server host provider, and currently maintains that status.

91.     ServerStack currently hosts the website XVideos.com and its related pornography affiliates, including but not limited to XNXX.com and the marketing arm of XVideos.com, Traffic Factory.

92.     ServerStack was bought by Digital Ocean Inc. in 2013 and continued to be wholly owned, operated, and controlled by Digital Ocean, Inc., until Digital Ocean Inc. was terminated and reorganized into Digital Ocean, LLC and Digital Ocean Holdings, Inc.

93.     Ben Uretsky, the owner, CEO, and creator of ServerStack and DigitalOcean, Inc. during reorganization formed the ultimate parent company, Digital Ocean Holdings, Inc. in February 2018.

94.     Ben Uretsky described the partnership with its client website clients as follows:

> [T]he first company that I started was called ServerStack and it managed hosting, just taking care of the customer environment online.  So let's say you generate some revenue because you are a retailer, so e-commerce or you drive some sort of a subscription network maybe it's video ads or advertising in general, in other words you are generating revenue online, you want to make sure that your website stays active. And so we monitored and took care of that entire environment, provided a 100% uptime SLA, took care of back up security, capacity planning, network expansion, *just everything that falls within IT management and helped our customers grow their business*. And so what was great about that business was that as you sign up that first customer, more often than not, they continued to grow their business, so each month, each account produces more revenue and the goal is to get as many more accounts as you can.[29]

95.     ServerStack appears to have ceased operating independently of DigitalOcean when it was purchased in 2013.  Serverstack's website, blog, Twitter account, and Facebook page have not been updated with any new information or

---

[29] https://www.cleverism.com/digitalocean-interview-ceo-ben-uretsky/.

CLASS ACTION COMPLAINT

marketing materials since 2013.[30]      Essentially, upon information and belief, ServerStack is a shell company wholly operated and controlled by Digital Ocean Holdings, Inc.

96.    ServerStack, the sole server host for XVideos, is being operated exclusively by Digital Ocean Holdings, Inc. who shares executives, operations, office space and employees with Digital Ocean Holdings and Digital Oceans LLC.

97.    Digital Ocean Holdings, Inc. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of ServerStack.

98.    Server Defendants are a single and joint employer with a high degree of interrelated, intermingled, and unified operations.

99.    Server Defendants jointly employ or ratify the employment of individuals through horizontal joint employment or vertical joint employment.

100.   As an integrated enterprise or joint employer, Server Defendants are separately and jointly responsible for compliance with all applicable laws.

101.   As an integrated enterprise and or joint employer, Server Defendants are jointly and severally liable for any damages caused by employees.

102.   During the time period relevant to the allegations contained herein, the Server  Defendants were in an agency relationship created through one or more of the following actions:

     a.  sharing profits,

     b.  standardized operations, policy, and training methods for employees;

     c.  sharing executive officer, Ben Uretsky;

     d.  sharing executive office locations in New York;

     e.  building and maintaining ServerStack, Inc. owned and operated by Digital Ocean Holdings, Inc. in a manner specified by Defendant

---

[30] https://www.serverstack.com/tour.html.

Digital Ocean Holdings, Inc.;

    f.  standardized rules of operation;

    g.  regular inspection of the data being reviewed, stored, optimized, processed, stored;

    h.  prices and expenses fixed by Defendant Digital Ocean Holdings, Inc; or

    i.  any actions that deprive ServerStack of independence in business operations.

**D. Server Defendants Facilitate Sex Trafficking of Minors, including Jane Doe**

103.  ServerStack, through Digital Ocean Holdings is more than just a dormant server hosting backup storage.  The Server Defendants are interactive partners with XVideos.com.  ServerStack boasts that it scaled "a website's infrastructure to serve 150 million pageviews per day through a "single managed dedicated server."  Upon information and belief, the partnership and business growth mentioned in that boast is that of Xvideos.com.

104.  ServerStack boasts that it maintains fully managed servers for its clients to support and optimize usage. ServerStack's services include creating and managing server infrastructure for each individual website component, such as the comment system, the video players, and search tools.  Xvideos uses a comment system, a video player, and a search tool on its website. Upon information and belief, these processes optimize and manipulate data, increase revenue, and promote interaction with child pornography, including that depicting Plaintiff and other class members.

105.  A key function of XVideos is receiving and encoding videos from users. Encoding a video converts it to a format suitable for the XVideos video player. This process also allows XVideos to manipulate, review, and edit videos to capture, create, and publish thumbnail images, including videos of Plaintiff and other minors.  Video encoding, thumbnail creation, and video playing are critical functions provided by Serverstack's application servers for XVideos. ServerStack independently advertised

their skill with implementing video functions on their blog.[31]

106. A key XVideos function is its video search tool. Generally, searching a website requires that website to be indexed, a process that gathers, organizes, and creates information about each video. That information is set up in a format that responds to searches by users quickly and efficiently. Searching and indexing are critical functions provided by Serverstack's application servers for XVideos.

107. Key XVideos functions also include social elements, including commenting on individual videos and chat services. There are millions of comments on XVideos, and XVideos chatting services include direct, non-public, user to user image sharing, between tens of thousands of users on the site. These commenting and chatting services are critical functions provided by Serverstack's application servers for Xvideos.

108. Without active management of these servers by ServerStack, XVideos would routinely stop functioning.

109. Upon information and belief, ServerStack provides at least one dedicated employee to manage, manipulate, and strategize opportunities to "help grow the XVideo business."

110. Upon information and belief, ServerStack provides the infrastructure and was the mind behind interactive features like the unique, exclusive, and internal communication systems within Xvideos.

111. In the last two years, Digital Ocean reported more than 75 instances of child pornography to the National Center for Missing & Exploited Children.[32]

112. WGCZ actively controls how videos are posted; the discussions/comments surrounding particular videos and images; processes for

---

[31] https://www.serverstack.com/blog/2012/03/13/live-video-streaming-to-any-mobile-device-with-wowza-media-server-hosting/index.html.

[32] National Center for Missing & Exploited Children, 2019 and 2020 Reports provided by Electronic Service Providers. https://www.missingkids.org/gethelpnow/cybertipline

1   viewing, posting, and creating accounts; and processes for encouraging and

2   rewarding income and fees for downloaded and viewed content.

3      113.   Upon information and belief, Server Defendants assist WGCZ in

4   customizing how (1) videos are posted; (2) the discussions/comments surrounding

5   particular videos and images; (3) content consumers and posters view, post, and

6   create accounts; and (4) to monetize viewed and downloaded content.

7      114.   WGCZ and Server Defendants work together to optimize data to steer

8   viewers toward content that they seek the most.  More user engagement means more

9   profit.  More views means more money.

10     115.   Traffic Factory is a web advertising and digital marketing company

11  created by WGCZ for use on its XVideos site and also maintained by Server

12  Defendants.[33]

13     116.   WGCZ's revenue model includes being able to sell ads to advertisers.  If

14  users are searching for a term frequently then WGCZ can produce or tag materials

15  based on frequent search terms by the users.  Upon information and belief, WGCZ

16  edits advertisements placed on its website and, through Traffic Factory, facilitates

17  data-driven decisions about advertising content.   These ads frequently highlight

18  search terms like "teen" and "toddler" which promote the use and creation of child

19  sexual abuse materials.



24     117.   Upon information and belief, WGCZ developed ads and affirmatively

25  chose the content characteristics and categories to target users and direct  ads.

[33] https://www.trafficfactory.com/index.html.

CLASS ACTION COMPLAINT

118.   To draw in new users and maintain market share, WGCZ working together with Server Defendants make most of its library available for free, even without creating an account.   In this way, WGCZ through Server Defendants distributes content -- including child pornography -- to anyone.

119.   Users can access as much pornography as they like without creating an account.   WGCZ analyzes and optimizes user data to subtly lead viewers to create accounts  for user convenience.  This permits WGCZ to better track and understand what users like.   WGCZ uses the data to facilitate and route viewers to increased engagement with the platform and leads viewers to paid subscriptions offering premium content reflecting the viewer's preferences, even if that content involves child rape, pornography, or other rapes.

120.  WGCZ sells its Red Service subscription which enables users to "download videos in HD" and "chat with other users through the [private] VPN system" and other benefits all managed, maintained, and facilitated by WGCZ for a profit.

121.   WGCZ's "content program" pays "millions a year to content providers." Account holders on its model or channel split profits with WGCZ through (1) advertisement income sharing; (2) revenue sharing; and (3) Xvideos red share accounts.

122.   WGCZ does not have adequate protocols and procedures to identify, remove and report videos with titles or tags that capture words like "toddler," "elementary," "little baby girl," or other graphic, criminal or inappropriate tags and content.

123.   WGCZ is generating millions in advertising and membership revenue, applies sophisticated data analytics to troll and monitor its users;  and yet employs no effective system to reliably verify the age or consent of those featured in the pornographic content, or most importantly prevent sex trafficking of the most vulnerable victims whose bodies have been sold for profit.

124. WGCZ nor Server Defendants took meaningful initiative to verify whether illegal content existed in a particular video or image, whether those in the videos or images were minors, forced participants, or non-consenting participants because they were asleep, drugged, drunk, or otherwise incapacitated, or to sufficiently validate the identity of the account owner such as requiring a two-step verification process (true credit card or bank account matching an official photo ID for the account holder); requiring IP addresses and personal information of the owner and operator of the device used to post the video or image; and a detection of persons in a video with a match to IDs uploaded to the site.

**E. Sex Trafficking of Plaintiff Jane Doe via XVideos**

125. Jane Doe was trafficked when she was just fourteen (14) years old.

126. When she was still a minor, a sex trafficker forced Jane Doe to participate in the creation of videos of adults engaging in sex acts with her.

127. As a minor, Jane Doe's traffickers also sold her for sex and some of the sex acts forced upon Jane Doe were recorded on video and uploaded to the xVideos website.

128. Jane Doe was not paid for her participation in the production of these videos.

129. Videos of adults engaging in sex acts with Jane Doe while she was a minor were uploaded and disseminated through websites owned, operated and/or controlled by Defendants, including, but not limited to XVideos. Videos of these sex acts with the minor Jane Doe continued to turn profits as they were reviewed, downloaded, stored, and disseminated.

130. At least four videos that included Jane Doe being trafficked as a minor have been identified on WGCZ sites. The names and other features of the videos are likely to jeopardize Jane Doe's anonymity in this proceeding. For Jane Doe's privacy and safety, Plaintiff will be moving for leave to file the names of those videos with the Court under seal.

KAZEROUNI
LAW GROUP, APC

131.   At least one "content partner" and official "channel" on XVideos disseminated these illegal videos of Jane Doe's rape. This XVideos "content partner" continues to be a promoted channel on XVideos even after Plaintiff's videos were removed in response to a cease and desist letter sent in Fall 2020 identifying the videos as illegal child sexual abuse material and depictions of Plaintiff's sex trafficking.

132.   Neither XVideos, nor any other website, owned or operated by WGCZ Defendants undertook any measure to verify Jane Doe's identity or age. As a result, child sex abuse material ("CSAM") depicting Jane Doe was distributed broadly throughout the world on Defendants' internet websites.

133.   During the time that WGCZ Defendants distributed and advertised the CSAM depicting Jane Doe they profited financially from the videos through the sale of advertising and by drawing users to their websites to view the videos.

134.   Jane Doe continues to be traumatized, every single day, by WGCZ, whose platform is being used to permit the continued and repeated dissemination of these horrific videos for sexual gratification and for profit.

135.   Jane Doe knows that her videos have been downloaded, using the easy-to-find "Download" button that WGCZ placed on its websites.

136.   As described above, WGXCZ's moderation practices are inadequate, and the Defendants have frequently permitted the re-uploading of illicit videos.  The broad dissemination of child sex abuse material depicting Jane Doe has severely harmed Jane Doe, including financial, physical, emotional, and reputational harm. She is at risk that the videos of her abuse will be further disseminated -- even uploaded a second time to a WGCZ platform, under a different name or with different tags, leading to further harm to her.

**F.  Jane Doe and Members of the Class Continue to Suffer Irreparable Harm**

137.   Class members, including Plaintiff, remain at risk of irreparable harm due to Defendants' failure to enact and enforce appropriate and sufficient policies,

procedures, and processes for the prevention of child pornography from being added to the WGCZ Defendants' sites.

138. On behalf of the Class and herself, Plaintiff seeks injunctive and equitable relief requiring the Defendants to identify and remove child pornography and implement corporate-wide policies and practices to prevent continued dissemination of child pornography or child sex trafficking.

139. Because of the insidious nature of child sex trafficking and child pornography, all of this relief is necessary to protect the present and future interests of Plaintiff and Class members.

## CAUSES OF ACTION

### COUNT I

### BENEFITING FROM A SEX TRAFFICKING VENTURE

### 18 U.S.C. §§ 1591 AND 1595

*(Plaintiff and the Class Against All Defendants)*

140. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

141. Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate 18 U.S.C. §§ 1591(a)(1) and 1595(a) violations, occurring within the territorial jurisdiction of the United States.

142. Defendants' conduct was in, or affected, interstate and/or foreign commerce.

143. Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

144. Defendants monetize content on their platforms and servers, through advertisements and data collection as well as direct fees from production/uploading agreements with child traffickers.

145. Defendants knowingly benefited from, and/or received something of

value for participating in what they knew or should have known was, or recklessly disregarded as being, a sex trafficking venture, namely, commercial sex acts featuring Plaintiff and other Class members.

146.   Defendants' employees and agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of minors.

147.   Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, violate 18 U.S.C. §1595.  Specifically, Defendants had a statutory obligation not to benefit in any way from a sex trafficking venture under 18 U.S.C. §1591(a).  At all relevant times, Defendants breached this duty by facilitating or profiting from persons under the age of 18 engaging in commercial sex acts.

148.   Defendants' conduct has caused Class members, including Plaintiff, serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT II

## RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY
## 18 U.S.C. § 2252 and 2252A

*(Plaintiff and the Class against All Defendants)*

149.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

150.   Defendants knowingly received, possessed, and distributed child pornography depicting Class members including Plaintiff, violating 18 U.S.C. § 2252.

151.   Defendants' receipt and distribution of child pornography occurred in or affected interstate or foreign commerce.

152.   As a proximate result of Defendants' violation of 18 U.S.C. § 2252A, Class members, including Plaintiff, suffered serious harm, including physical, psychological, financial, and reputational harm.

153.   Defendants' conduct was malicious, oppressive, or in reckless disregard of Plaintiff's rights and Class members' rights.  They are entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

## COUNT III

## RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY
## 18 U.S.C. § 2260

*(Plaintiff and the Class Against All Defendants)*

154.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

155.   Defendants, at least some of them outside the United States, knowingly received, possessed, and distributed child pornography depicting Class members including Plaintiff, violating 18 U.S.C. § 2260.

156.   At least some of the Defendants' receipt, possession, and distribution of child pornography occurred outside the United States.

157.   As a proximate result of Defendants' violation of 18 U.S.C. § 2260, Class members, including Plaintiff, suffered serious harm, including physical, psychological, financial, and reputational harm.

158.   Defendants' conduct was malicious, oppressive, or in reckless disregard of Plaintiff's rights and Class members' rights.  They are entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2255(a).

## COUNT IV

## VIOLATION OF DUTY TO REPORT CHILD SEXUAL ABUSE MATERIAL
## 18 U.S.C. § 2258A

*(Plaintiff and the Class against all Defendants)*

159.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

160.   As an "electronic communication service provider," Defendants' websites are a "provider" under 18 U.S.C. §§ 2258e(6) and 2258A.

161.   Defendants had actual knowledge that  sexual exploitation material of children was being published on their websites, violating 18 U.S.C. § 2252.

162.   Defendants knowingly engaged in intentional misconduct by ignoring clear notice of online sexual exploitation material of children. 18 U.S.C. § 2258B(b)(1).

163.   Defendants' conduct constitutes a failure to act with reckless disregard to a substantial risk of causing physical injury without physical justification. 18 U.S.C. § 2258B(b)(2)(B).

164.   Defendants' conduct constitutes a failure to act for a purpose unrelated to the performance of any responsibility or function under 18 U.S.C. § 2258B(b)(2)(C).

165.   Defendants' conduct has seriously harmed Plaintiff and the Class, including without limitation, physical, psychological, financial, and reputational harm.

## COUNT V

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")

## Cal. Bus. & Prof. Code § 17200

*(Plaintiff and the California Subclass against all Defendants)*

166.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

167.   Defendants have violated the UCL by engaging in unlawful, unfair, and fraudulent business acts and practices.

168.   Defendants knowingly had inadequate age verification systems in place that enabled users to upload child pornography to Defendants' websites.

169.   Defendants' conduct constitutes an unlawful, unfair, and/or fraudulent business act and practice.

KAZEROUNI
LAW GROUP, APC

**CLASS ACTION ALLEGATIONS**

170.  Plaintiff Jane Doe brings this action under to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of themselves and the following Class:

> All persons, who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A, or (3) engaging in sexually explicit conduct as defined under 18 U.S.C. § 2260, that has been made available for viewing on any website owned or operated by the Defendants. (the "Class").

171.  Plaintiff Jane Doe also brings this action on behalf of:

> All persons residing in California who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A, or (3) engaging in sexually explicit conduct as defined under 18 U.S.C. § 2260, that has been made available for viewing on any website owned or operated by the Defendants. (the "California Subclass").

172.  Plaintiff reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

173.  <u>Numerosity</u>: The Class consists of thousands of people, making joinder impracticable, satisfying Fed. R. Civ. P. 23(a)(1). The exact Class size and individual Class member identities cannot be known.  However, based on the millions of abuse reports made to NCMEC, and Defendants' status as the largest distributor of pornography in the United States, the numerosity requirement can be established.

174.  <u>Typicality</u>: Plaintiff's claims are typical of the claims of the other members of the Class Plaintiff seeks to represent. The Plaintiff's and the other Class members' claims are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' sex trafficking profiteering.  Plaintiff, like all members of the Class, was victimized by Defendants profiting from videos

depicting Plaintiff in commercial sex acts or child pornography which Defendants knew, or should have known, were filmed while they were minors.

175.   <u>Commonality</u>: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect only individual Class members, under Fed. R. Civ. P. 23(a)(2).   Additionally, class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.   Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

> a.   Whether videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms or servers;
>
> b.   Whether Defendants profited from videos depicting minors in commercial sex acts or child pornography appearing on Defendants' platforms or servers;
>
> c.   Whether Defendants' internal controls were adequate to stop videos depicting minors in commercial sex acts or child pornography from appearing on Defendants' platforms or servers;
>
> d.   Whether Defendants knew or should have known that videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms or servers;
>
> e.   Whether Defendants' conduct constitutes benefiting from or facilitating sex trafficking, dissemination of videos depicting minors in commercial sex acts or child pornography, or child exploitation in violation of 18 U.S.C. §§ 1591, 1595, and 2252A; and
>
> f.   The scope of the injunctive relief and damages to which the Plaintiff and members of the Class are entitled.

176.   <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests and the interests of all other members of the Class are identical, and Plaintiff is cognizant of her duty and responsibility to the Class.

Accordingly, Plaintiff can fairly and adequately represent the interests of the Class. Moreover, Plaintiff's counsel are competent and have a wealth of experience litigating claims regarding sex trafficking and exploitation of minors, complex commercial litigation, and class actions. Plaintiff and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests. Neither Plaintiff nor their counsel have any interests adverse to those of the other members of the Class.

177.   Equitable relief: Class certification is appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole.  The nature of the relief sought is described in this Complaint.

178.   Absent a class action, most of the members of the Class would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. Class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Finally, Class treatment would minimize the trauma that Class members would experience as a result of litigating their claims on an individual basis, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter a judgment on their behalf and against Defendants, and grant the following relief:

A.   Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a), 23(b)(2), 23(b)(3) and (c)(4);

B.   Designate Plaintiff as representative of the proposed Class and Plaintiff's counsel as counsel for the Class;

CLASS ACTION COMPLAINT

C.   Award injunctive or any other equitable relief, to Plaintiff and the Class, requiring the Defendants to identify and remove child pornography and implement corporate-wide policies and practices to prevent continued dissemination of child pornography or child sex trafficking, including:

a.   Content uploaders' accounts should be opened only with bank or credit card information, so that they can be identified.

b.   Government-issued photo identification should be required for each person in a video, and it should be required that each person is at least eighteen years old.

c.   Defendants should use facial recognition technology to verify that each performer in a video or image upload is legal.

d.   Defendants should remove all images and videos of Plaintiff and Class members from their platforms, and archive them for use in this litigation.

e.   Defendants should timely respond to all reports of child pornography, and proactively disable the streaming or downloading of reported videos without a human moderator.

f.   Defendants should disable the "Download" button on videos so that it is not as easy for sex traffickers to disseminate videos of Plaintiff and Class Members, causing future harm.

g.   Defendants should send all government IDs that have been associated with any video or account to the databases maintained by States and the United States, including the FBI and the National Center for Missing and Exploited Children, so that sex offenders can be identified and sex-crime victims can be protected.

h.    Defendants should use "video fingerprinting" technology to prevent the repeat upload of videos of Plaintiff' and Class members' rapes.

i.    Defendants should use human moderators to screen each video and image for child pornography or trafficking of minors before this material is displayed or otherwise disseminated.

j.    Defendants should adequately train individuals tasked with screening videos and images on identifying potential child pornography or trafficking.

k.    Defendants should employ standards for screening for child pornography.

l.    Defendants should promptly terminate any employees who have failed to fairly moderate material.

m.    Defendants should adequately staff their moderation teams tasked with screening videos and images so that all videos are screened in their entirety.

n.    Defendants should end the employee bonus program that is based on the raw number of videos approved per year.

o.    Defendants should ban individuals who have uploaded child pornography or trafficking videos or images from having the ability to upload anything to a website owned, controlled, or operated by Defendants ever again.

p.    Defendants should limit the number of hours moderators or employees can review videos and images on a daily basis, so as to reduce the incidence of "employee burnout" or turnover relating to the traumatic nature of the work.

CLASS ACTION COMPLAINT

q.    Defendants should refuse to publish videos and images that have been flagged or are suspected of containing child pornography or trafficking.

r.    Defendants should immediately send all videos and images with suspected or confirmed child pornography or trafficking to NCMEC's clearinghouse, along with all information available to identify perpetrators or victims.

D.    Award all available damages including but not limited to compensatory and punitive damages in favor of Plaintiff and the Class; and

E.    Award Plaintiff and the Class prejudgment interest, costs and attorneys' fees;

F.    Require restitution and disgorgement of all profits and unjust enrichment obtained as a result of Defendants' unlawful conduct; and

G.    Retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 19, 2021                              Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**


By:   ___/s/ Abbas Kazerounian_____
      Abbas Kazerounian, Esq.
      Mona Amini, Esq.
      245 Fischer Avenue, Unit D1
      Costa Mesa, California 92626
      Telephone: (800) 400-6808
      Facsimile:  (800) 520-5523
      ak@kazlg.com
      mona@kazlg.com

1     Gregory Zarzaur (ASB-0759-E45Z)*
THE ZARZAUR LAW FIRM
2     2332 Second Avenue North
Birmingham, Alabama 35203
3     T: (205) 983-7985
E: gregory@zarzaur.com
4     *pro hac vice application forthcoming

5     Brian Kent*
Gaetano D. Andrea*
6     Jill P. Roth*
M. Stewart Ryan*
7     Alexandria MacMaster
LAFFEY, BUCCI & KENT, LLP
8     1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
9     T: (215) 399-9255
E: bkent@lbk-law.com
10    gdandrea@lbk-law.com
jroth@lbk-law.com
11    sryan@lbk-law.com
amacmaster@lbk-law.com
12    *pro hac vice application forthcoming

13    Benjamin W. Bull*
Peter A. Gentala*
14    Dani Bianculli Pinter*
Christen M. Price*
15    NATIONAL CENTER ON SEXUAL
EXPLOITATION
16    1201 F Street NW, Suite 200
Washington, D.C. 20004
17    T: (202) 393-7245
E: lawcenter@ncose.com
18    *pro hac vice application forthcoming

19

20    Louis C. Bechtle*
Kevin Dooley Kent*
21    Mark B. Schoeller*
Joseph W. Jesiolowski*
22    CONRAD O'BRIEN PC
Centre Square West Tower
23    1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
24    T: (215) 864-9600
kkent@conradobrien.com
25    mschoeller@conradobrein.com
jjesiolowski@conradobrien.com
26    lbechtle@conradobrien.com
*pro hac vice application forthcoming

27

28    Joshua P. Hayes
PRINCE GLOVER HAYES

- 41 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

701 Rice Mine Road
Tuscaloosa, Alabama 35406
T: (205) 345-1234
E: jhayes@princelaw.net
*pro hac vice application forthcoming*

*Counsel for Plaintiff and the putative Class*

CLASS ACTION COMPLAINT