1  **KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
2  ak@kazlg.com
Mona Amini, Esq. (SBN: 296829)
3  mona@kazlg.com
245 Fischer Avenue, Unit D1
4  Costa Mesa, California 92626
Telephone: (800) 400-6808
5  Facsimile: (800) 520-5523

6  **LEVIN PAPANTONIO RAFFERTY**
Kimberly Lambert Adams
7  kadams@levinlaw.com
316 S. Bavien Street, Suite 600
8  Pensacola, FL 32502
Telephone: (850) 435-7056
9
*Attorneys for Plaintiff,*
10  *JANE DOE*

11                **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

14  JANE DOE, on behalf of herself and all          Case No.:  2:21-cv-02428-VAP-SK
others similarly situated,
15
                                                   **FIRST AMENDED CLASS ACTION**
16                        Plaintiff,               **COMPLAINT**

17        vs.

18  WebGroup Czech Republic, a.s.; WGCZ
Holding, a.s.; WGCZ Limited, s.r.o.; NKL
19  Associates s.r.o.; Traffic F, s.r.o.; GTFlix
TV, s.r.o.; FTCP, s.r.o.; VS Media, Inc.;
20  HC Media, s.r.o.; HC Multimedia LLC;
FBP Media s.r.o.; Serverstack, Inc., Digital
21  Ocean Holdings, Inc.; and Digital Ocean,
LLC f/k/a/ Digital Ocean, Inc.; Stephane
22  Michael Pacaud; Deborah Malorie Pacaud,

23                        Defendants.

24

25

26

27

28

**INTRODUCTION**

1.      Plaintiff and the proposed class are victims and survivors of childhood sex trafficking who had videos and images of their childhood sex trafficking sold and/or distributed on websites, including XVideos, owned, operated, managed, controlled, and facilitated by Defendants. Defendants have capitalized on the Plaintiffs' child sexual exploitation material for their own financial benefit.

2.      The XVideos website is a complicated enterprise of domains owned, operated, controlled and/or actively managed collectively by the Defendants.

3.      Defendants operate, develop and profit from XVideos' complex corporate scheme.  The XVideos website enterprise is grounded in the United States while being complemented and hidden by a web of Czech companies.

4.      The XVideos corporate enterprise includes subsidiaries, "related parties", a server company actively managing and developing the XVideos website enterprise, and two individual siblings who control the WGCZ parent/holding company, subsidiaries and most "related parties".

5.      The Defendants, on their websites and servers, created, organized, facilitated dissemination, optimization and monetization of images and videos that depict child sexual abuse material ("CSAM"), often referred to as child pornography. Each of these images and videos, including those depicting the Plaintiff, is a crime scene the Defendants monetized.

6.      Defendants are a coordinated group of individuals and companies which knowingly benefit from child sex trafficking by, among other things, developing, analyzing, and monetizing uploaded content and/or manipulating search terms and media content on XVideos and/or developing content and systems to drive the continued uploading and consumption of CSAM for profit.

7.      Defendants use sophisticated technology to track and promote the types of material that drives traffic and profits to its websites. Defendants' conversely refuse to implement reasonable protections known to mitigate or prevent CSAM, including

FIRST AMENDED CLASS ACTION COMPLAINT

but not limited to employing age or consent verification measures.  Instead, Defendants facilitate the anonymity of those child sex traffickers who upload it and anonymous communication among those criminals looking for CSAM, which ensures that the practice continues and grows Defendants' profits.

8.     The Defendants employ a plethora of corporate entities that operate as a single enterprise under the ultimate control and for the ultimate benefit of their primary principals, the Pacaud siblings and a select few of their close confederates.

9.     Plaintiff Jane Doe, a minor at the time of her sex trafficking, is just one of the many victims, from among the class members she represents, of Defendants' enterprise that has elevated profit over the well-being of repeatedly traumatized child victims of sex trafficking.

10.     Defendants' disregard for and exploitation of these victims is reinforced by the Defendants' frequent and persistent refusal to remove videos of Plaintiff's child sex trafficking and the child sex trafficking of many other class members from Defendants' websites despite repeated requests for removal.

11.     The Plaintiff brings this action against the Defendants, who financially benefited from, or otherwise participated in, a sex trafficking venture in which the Plaintiff was a victim.  Plaintiff, who was under eighteen years of age at the time of filming, was depicted in commercial sex acts and child pornography, which was then made available for viewing on websites owned, operated, and facilitated by the Defendants.  The trafficking and commercial exploitation of the Plaintiff violated, among other laws, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591 and 1595.

## JURISDICTION AND VENUE

12.     The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

13.     The Court may properly exercise personal jurisdiction over all Defendants.  Each of the Defendants maintains minimum contacts with California, such

1    that maintaining this lawsuit does not offend traditional notions of fair play and
2    substantial justice.

3         14.    WebGroup Czech Republic, a.s.; WGCZ Holding, a.s.; WGCZ Limited,
4    s.r.o.; NKL Associates s.r.o.; Traffic F, s.r.o.; GTFlix TV, s.r.o.; FTCP, s.r.o.; VS
5    Media, Inc.; HC Media, s.r.o.; and HC Multimedia LLC (collectively, "WGCZ,"
6    "WGCZ entities," or "WGCZ Defendants") are essentially the same entity, act as a
7    single enterprise for a common purpose, and share each other's jurisdictional contacts.

8         15.    The XVideos website enterprise domains are displayed in English and
9    VPN access is provided to hide exact locations of visitors, including those in the United
10   States.

11        16.    The entire XVideo enterprise depends on United States infrastructure.

12        17.    WGCZ does substantial business in the United States, including
13   California, by (1) using a California based company to actively manage its website and
14   servers, at least one of which is physically located in California; (2) selling
15   subscriptions and advertisements to US companies; (3) using a US company with US
16   servers as a content delivery network ("CDN") to essentially copy original content to
17   additional servers located in the United States, including California, to enhance the
18   speed of the website, among other things; (4) processing subscription payments
19   through a California company; (5) paying profits to video uploaders who post videos
20   through a California company; (6) receiving payment from companies advertising on
21   XVideos website through a California company; (7) using a California company for
22   email service, including direct transactional email; (8) using a California company to
23   host its email servers; and (9) developing, managing, and/controlling part of the
24   XVideos website enterprise directly out of a California registered entity.

25        18.    Additionally, the majority of WGCZ's market is concentrated in the
26   United States.  In July 2021, XVideos.com was ranked the 7th most trafficked website
27   globally and ranked the 9th most trafficked website in the United States. Another

28

KAZEROUNI
LAW GROUP, APC

XVideos domain in the XVideos enterprise, Xnxx.com, was ranked the 10th most trafficked website both in the world and in the United States.

19.     Data from July 2021 show that nearly 24% of Xnxx.com traffic comes from the United States (followed by Russia, with 5% of the traffic).  For XVideos.com, 19% of the traffic comes from the United States (followed by Japan, with almost 7% of the traffic).

20.     On information and belief, some of the content in the XVideos.com and Xnxx.com domains and subdomains is hosted on servers located in the United States.

21.     WGCZ developed and controls a domain called Traffic Factory, which is essentially little more than a landing page developed by WGCZ to drive new advertising business to be viewed and monetized on the XVideos website.  Traffic Factory is actively managed in the United States by Traffic Factory's "Team America" with representative account managers residing in the United States.

22.     Moreover, WGCZ boasts geo-fencing and location-based advertising through its advertising platform, Traffic Factory.  The scheme encourages WGCZ to collect data from California consumers and targets advertisements specifically to Californians based on their location.

23.     Additional business contacts by WGCZ include, but are not limited to, WGCZ's ownership and control of Penthouse World Media LLC; Penthouse World Broadcasting LLC; Penthouse World Digital LLC; Penthouse World Licensing LLC; and Penthouse World Publishing LLC ("the Penthouse Entities"). The Penthouse Entities are located at 8944 Mason Ave, Chatsworth, California 91311 and their manager/member is Robert Seifert, who is also a WGCZ executive.

24.     Additionally, on information and belief, until 2020, one or more of the WGCZ Defendants owned and controlled Defendant VS Media, Inc., located at 31416 Agoura Rd, Westlake Village, CA 91361. VS Media, Inc. manages, operates and controls an XVideos enterprise webcam model domain/platform, connected to the

XVideos infrastructure from their California headquarters.[1]  In this regard, XVideos directs users, loaders, viewers, or otherwise anyone interested in becoming an "XVideos webcam model" to the California VS Media team stating, "Once you click submit, a member of our Los Angeles-based staff will contact you to help you complete the setup process for new live cam models."[2] Defendants invite anyone with questions to reach out to the XVideos "broadcast support team at broadcastsupport@vsmedia.com." In May 2020, WGCZ executives formed Worldweb Services, sro, a Czech company, for the purpose of owning VS Media, Inc, a U.S. entity.  WorldWeb Services, s.r.o., was opened by a Pacaud confidant and familiar XVideos enterprise director, operator and/or executive, Robert William Seifert.[3]  The registered address for WorldWeb Services, s.r.o. is again, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague.

25.    WGCZ consistently transacts business with California through the use of EPOCH, an internet payment service provider located at 3110 Main Street, Ste 220, in Santa Monica, California.  EPOCH processes transactions and payments, including subscription payments, related to videos viewed, maintained, and otherwise utilized by the XVideos platform.  Such transactional processing with EPOCH, a U.S. business, would require the WGCZ to open and maintain a U.S. merchant account before doing business with customers in California.  A merchant account is a bank account opened by businesses like WGCZ Defendants, so their payment processor has somewhere to deposit received funds. Businesses opening merchant accounts with the intention of doing business in the U.S. generally have to demonstrate that they are legitimate and have a history of successful customer transactions.

---

[1]*See*, https://www.xvideos-cams.com/broadcasters.php?tracker=xv_info_external.
[2] *Id.*
[3] *See*, https://or.justice.cz/ias/ui/vypis-sl-detail?dokument=62142157&subjektId=1088341&spis=1220047

26. Further, until April 2021, WGCZ Defendants consistently and systematically transacted business in California through their business relationship with PayPal. PayPal, a California corporation, was used by WGCZ Defendants to receive compensation from advertisers for advertisements placed on the XVideos website and to pay out compensation (in US dollars) to uploaders and users of the XVideos website. Given the revenue generated by WGCZ Defendants, hundreds of millions of U.S. dollars related to consistent financial activities with PayPal related to videos and operations on XVideos would have been processed through Paypal in California, including class members' videos containing CSAM and Plaintiff's video.[4]



27. WGCZ Defendants transact business in California and as such are required to register as a business entity in California. WGCZ benefits by transacting business in the United States, including California. WGCZ has either disregarded the corporate law and requirements to do business in California by WGCZ failing to register in California or are actually registered in California operating as VS Media.

28. Google, another California corporation located in Mountain View California, hosts XVideos email servers, specifically moving email to the recipients and/or storage.

29. SendGrid, now known as Twillio - SendGrid, located in Irvine, California creates and hosts emails with XVideos, which may include, but not be limited to,

_____

[4] *See*, https://www.nytimes.com/2021/04/16/opinion/sunday/companies-online-rape-videos.html

FIRST AMENDED CLASS ACTION COMPLAINT

1  transactional emails with XVideos, automated emails, new account details, account

2  confirmations, and forgotten passwords.

3      30.    As described in more detail below, XVideos is actively managed and

4  developed by DigitalOcean via the name ServerStack.  DigitalOcean is headquartered

5  and operated in California with at least one ServerStack server located in California.

6      31.    Upon information and belief, incorporated as part of the XVideos website

7  platform, WGCZ Defendants also incorporated and used as a shell in its corporate

8  scheme other U.S. pornography businesses, such as Donamis, LLC and MHUB1, LLC,

9  both registered and located in Miami, Florida.

10     32.    Furthermore, WGCZ was issued a U.S. trademark to protect its XVideos

11  websites including enterprise domains XVideos.com, Xnxx.com, Xvideosdaily.com,

12  and Xvideostoday.net.    XVideos has brought numerous complaints under U.S.

13  trademark law to avail themselves of these protections. In most of these complaints,

14  WGCZ is described as a U.S. company, in particular Las Vegas, Nevada,[5] where they

15  are described as "domiciled", and once in Miami, Florida.[6]

16     33.    In a 2016 copyright case brought against WGCZ in the District of Nevada,

17  Robert Seifert, a WGCZ executive and self-described administrative director for the

18  WGCZ defendants, challenged Nevada jurisdiction despite the prior trademark cases,

19  claiming that the World Intellectual Property Organization (WIPO) made a mistake in

20  its description of the parties.[7]  Seifert stated that WIPO must have interpreted WGCZ's

21  attorney's offices in Las Vegas as its location as well. Seifert went on to claim that

22

23  _____

24  [5] WGCZ SRO c. EAG, Case No. DES2016-0022
    https://www.wipo.int/amc/en/domains/decisions/text/2016/des2016-0022.html.

25  [6] WGCZ S.R.O. v. Registration Private, Domains By Proxy, LLC / Rafael Santos Case No. D2017-
    1870

26  https://www.wipo.int/amc/en/domains/decisions/text/2017/d2017-1870.html.

27  [7] From Declaration of Robert Seifert in support of Defendant WGCZ, S.R.O.'s 12(b)(2) MTD,
    Hydrenta HLP Int. Limited v. WGCZ, S.R.O., a foreign corporation, individually and d/b/a
    XVIDEOS.COM, XVIDEOSDAILY.COM, and XVIDEOSTODAY.NET; Does 1-10, 7-26-2016,

28  Case No. 2:15-cv-01250-LDG-(NJK), July 26, 2016, ¶ 5. Note, the jurisdiction question in this case
    was never answered as the case was voluntarily dismissed by plaintiffs.

1   "WGCZ has never represented that it is a resident of Las Vegas, Nevada because it is

2   not."[8] However, WGCZ sought correction of this so-called mistake in only one WIPO

3   case which named its "related entity", NKL[9], and never sought a similar correction in

4   the many other cases describing WGCZ as a U.S. company.

5       34.   Besides the case where this correction occurred and one other entry,

6   WGCZ otherwise describes itself in the above-referenced trademark cases as a U.S.

7   company.[10]  The fact that they are only named as a Czech company one time is less an

8   indication of error, as Seifert claims, and more an indication that they have multiple

9   business locations, including in the U.S.

10      35.   Seifert and WGCZ argue that WIPO is only accurate the one time it

11  described WGCZ as being from the Czech Republic, yet WIPO is somehow inaccurate

12  the 16 times it describes WGCZ as having a U.S. location.[11]

13

14  _____

15  [8] *Id.*

16  [9] NKL Associates S.R.O. v. WhoIsProtectService.net Protectservice, Ltd. / Mark Frolov, Case No.
    D2015-0407, March 6, 2015, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2015-
    0407.

17  [10] WGCZ S.R.O. v. Timothy Hunt, Payvs Limited, Case No. DTV2014-0006, December 3, 2014,

18  https://www.wipo.int/amc/en/domains/search/text.jsp?case=DTV2014-0006.
    [11] WGCZ S.R.O. v. Registration Provate, Domains By Proxy, LLC / Rafael Santos Case No.

19  D2017-1870, 9-26-17, https://www.wipo.int/amc/en/domains/decisions/text/2017/d2017-1870.html;
    WGCZ S.R.O. v. Anna Zizek c/o Dynadot, Case No. D2019-0923, 4-24-19,

20  https://www.wipo.int/amc/en/domains/decisions/text/2019/d2019-0923.html; WGCZ S.R.O. v.
    Worldwide Media, Inc., Case No. D2014-0428, 3-19-14,

21  https://www.wipo.int/amc/en/domains/decisions/text/2014/d2014-0428.html;
    WGCZ S.R.O. v. WhoIs Agent, Profile Group, Case No. D2014-0665, 4-23-14.

22  https://www.wipo.int/amc/en/domains/decisions/text/2014/d2014-0665.html;
    WGCZ S.R.O. v. WhoIsProtectService.net / Ivan Makarov, Case No. D2014-0468, 3-26-14,

23  https://www.wipo.int/amc/en/domains/decisions/text/2014/d2014-0468.html;
    WGCZ S.R.O. v. WhoIsProtectService.net Protectservice, Ltd. / Jose Rodriguez, Case No. D2014-

24  0550, 4-4-14, https://www.wipo.int/amc/en/domains/decisions/text/2014/d2014-0550.html;
    Wgcz S.R.O. v. Balazs Suhajda, Case No. DCO2020-0002, 1-7-20,

25  https://www.wipo.int/amc/en/domains/decisions/text/2020/dco2020-0002.html; WGCZ SRO c.
    EAG, Case No. DES2016-0022, 8-19-16,

26  https://www.wipo.int/amc/en/domains/decisions/text/2016/des2016-0022.html; NKL Associates

27  S.R.O. v. Domain Administrator, Fundacion Privacy Services LTD, Case No. D2020-0416, United

28  States, 2-21-20, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2020-0416; WGCZ
    S.R.O. v. WhoIsProtectService.net Protect service, Ltd./AVO Ltd., Case No. D2014-0549, 4-4-14,

36.     The sex trafficking of Plaintiff, from which Defendants have directly benefited in violation of 18 U.S.C. §§ 1591 and 1595, occurred in California.

37.     The CSAM of Plaintiff, including the videos and depictions of Plaintiff's rape, sex trafficking and sexual exploitation on XVideos, were filmed in California.

38.     Defendants have reached into California and the United States to solicit and initiate business, including through globally accessible websites that are accessed and used in California and the United States on a regular basis.

39.     Defendants have engaged in significant, long-term business activity purposefully directed toward California and the United States, including through the maintenance of interactive websites that are directed at and accessible to residents of California and the United States.

40.     The visitors' [or members'] acts of accessing the defendants' websites constitute commercial relationships with Defendants, who ultimately profit from visitors [or members or both] by selling/directing advertising, collecting membership/access fees, etc.

41.     Defendants have knowingly created, maintained, and profited from the globally accessible XVideos websites, including associated domains that Californians and other United States residents use to access pornography, including CSAM.

---

http://www.wipo.int/amc/en/domains/search/text.jsp?case=D2014-0549; WGCZ S.R.O. v. Marcel Pondi / WhoIsProtectService.net Protectservice, Ltd., Case No. D2014-0491, 3-27-14, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2014-0491; WGCZ S.R.O. v. WhoIsProtectService.net Protectservice, Ltd. / AVO Ltd AVO Ltd, Case No. D2014-0545, 4-3-14 https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2014-0545; NKL Associates S.R.O. v. Ivan Misheveckiy, Case No. D2015-0495, 3-21-15, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2015-0495; NKL Associates S.R.O. v. Network Admin, XPRON Media, Case No. D2015-0503, 3-24-15, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2015-0503; NKL Associates S.R.O. v. WhoIsProtectService.net Protectservice, Ltd. / Andrey Kuzmenko, Case No. D2015-0405, 3-6-15, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2015-0405;  NKL Associates S.R.O. v. Web Manager, EUMedia, Case No. D2020-0417, 2-21-20, https://www.wipo.int/amc/en/domains/search/text.jsp?case=D2020-0417.

42.    The sex trafficking and sexual exploitation of Plaintiff (and members of the putative plaintiff class) and Defendants' actions in violation of the TVPRA and 18 U.S.C. § 2255/2255A occurred, in significant part, in California and throughout the United States, causing the infliction of actionable harm and injury to Plaintiff in California where Plaintiff resides.

43.    Defendants are present and conduct business in California as part of an integrated enterprise of entities that own, maintain, operate, assist, develop, and support globally accessible websites that disseminate and provide sexually explicit images and videos, including CSAM, to users in California and from which Defendants directly benefit and profit.

44.    Defendants' activities in California are continuous and systematic. Defendants have purposefully availed themselves of California jurisdiction. Defendants direct substantial business activity into this jurisdiction. There is a substantial nexus between Jane Doe's claims and Defendants' activities.

45.    Defendants participated in an effort to store, distribute, develop, optimize, advertise, market, create, facilitate, benefit and profit from CSAM on its websites while also encouraging benefits and profits to sex traffickers, including the Plaintiff's trafficker.

46.    As set forth in more detail below, WGCZ acts as the alter ego of its subsidiaries, "related parties", U.S. entities, and foreign counterparts and together act as a website enterprise under common control with integrated business resources in pursuit of a single business purpose.

47.    As set forth in more detail below, Defendant DigitalOcean acts as the alter ego of its initial company, ServerStack. DigitalOcean owns, controls, shares officers and locations, and actively manages ServerStack's clients, including WGCZ, and operations since at least 2013.

48.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 2255(c) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## PARTIES

49.     Plaintiff Jane Doe is an individual who is now the age of majority under California law and presently resides in California.  The Plaintiff is a victim of child sex trafficking and the creation of child pornography under applicable law.  She is also a courageous survivor willing to step forward and tell her story in the interests of justice and out of concern for other survivors.

50.     Due to the sensitive, private nature of Plaintiff's allegations, and the potential for harmful retaliation against her, Plaintiff requests this Court permit her to proceed under a pseudonym.  Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature.  For good cause, as exists here, the Court may permit Plaintiff to proceed in pseudonym to protect her from annoyance, embarrassment, oppression, or undue burden or expense.

51.     Here, Plaintiff would face imminent danger if her identity were known.  Granting pseudonym status is warranted because this litigation will involve the disclosure of identifying information that would allow Plaintiff's former traffickers to locate and harm her.

52.     Additionally, disclosing her identifying information would reveal stigmatizing sexual information, including child sex trafficking.  Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

53.     Defendants will not be prejudiced by Plaintiff's use of a pseudonym.  Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties are governed by a protective order.  Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the

public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal safety, private life, or future employment prospects.

54.    WGCZ includes a number of intertwined and related entities who have developed, operate and control the XVideos website enterprise.

a.    Defendant WebGroup Czech Republic, as (formerly WGCZ, s.r.o. and WGCZ, a.s.), with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Marjorie Grocq; Robert Seifert; and formerly by LK Management Limited; Konečná & Zacha, s.r.o., law office, IČ; and Kateřina Pokorná. WebGroup Czech Republic, a.s. owns the XVideos trademarks.

b.    Defendant WGCZ Holding, a.s., with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud, Stephane Pacaud, Marjorie Grocq, and Robert Seifert. WGCZ Holding, a.s., as of 2018, owns 100% interest in Defendant GTFlixTV, s.r.o., and WGCZ had a long-term loan agreement with GTFlix identified and calculated in "USD" (US Dollars).  WGCZ, a.s., NKL Associates, s.r.o., and Web Group Limited each had loans with WGCZ Holding a.s. as of its 2019 annual report.

c.    Defendant WGCZ Limited, s.r.o., with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Robert Seifert; and WGCZ Holding, a.s.

d.    Defendant NKL Associates s.r.o., with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Marjorie Grocq; Robert Seifert, and formerly LK Management Limited.  NKL Associates s.r.o. owns the XNXX trademarks.

e.    Defendant Traffic F, s.r.o., with a place of business at Krakovská 1366/25,

Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Stephane Pacaud; Robert Seifert; and formerly by LK Management, Limited, and Robert Caroll.  Traffic F, s.r.o., owns the Traffic Factory, which is essentially XVideos with a separate landing page for the ease of would-be advertisers and investors to find them more readily.  Traffic Factory's page is in English and it owns the Traffic Factory U.S. trademark.  Traffic F also owns 100% of the shares of MME Traffic, s.r.o.  MME Traffic, s.r.o. is located at the same address of Krakovská 1366/25, Nové Město, 110 00 Prague and is owned and/or managed by Malorie Deborah Pacaud and Robert William Seifert.  As of WGCZ's 2019 annual report, MME Traffic, s.r.o. is listed as having a contract on being the "clearing centre" for WGCZ and XVideos.

f. Defendant GTFlix TV, s.r.o., with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, and owned and/or managed by Malorie Pacaud; Marjorie Grocq; WGCZ Holding, a.s.; and formerly by Zeus Trade, s.r.o.; Danylo Kucherenko; Sofya Koroleva; Web Group Limited; Pedro Javier Vazquez Hernandez; Ing. Šárka Matoušková. GTFlix, TV, s.r.o. owns the Legal Porno U.S. trademarks.  In addition to the GTFlix TV's domain association, operations and development within the XVideos website enterprise, WGCZ's annual report in 2018 identifies GTFlix as a holder of a long-term loan which had been calculated into USD.

g. Defendant FTCP, s.r.o. (formerly FLIRT4FREE.cz, s.r.o.), with a place of business at Vodičkova 791/41, Nové Město, 110 00 Prague, and owned and/or managed by Helena Luňáková and Miroslav Mrňa, and formerly Online Services LTD.

h. Defendant VS Media, Inc., with a place of business at 31416 Agoura Rd #205, Westlake Village, CA 91361-5643, is owned and operated by

WGCZ via WorldWeb Services, s.r.o. VS Media, Inc. owns and operates Flirt4Free and Flirt4free hcz s.r.o., which are camming domains within the XVideos enterprise.  Flirt4Free.cz, s.r.o., identifies VS Media, Inc., in the United States as its authorized representative.  In May 2020, WGCZ executives formed Worldweb Services, s.r.o., a Czech company, for the purpose of owning VS Media, Inc., a U.S. entity.  WordWeb Services, s.r.o., was opened by a Pacaud confidant and familiar XVideos enterprise director, operator and/or executive, Robert William Seifert.  The registered address for WorldWeb Services, s.r.o. is again, with a place of business at Krakovská 1366/25, Nové Město, 110 00 Prague.

   i.  Defendant HC Media, s.r.o., with a place of business at Vodičkova 791/41, Nové Město, 110 00 Prague, is owned and/or managed by Miroslav Mrňa; Ing. Lucie Hrdinová, and HC Multimedia, LLC; and formerly FBP Media s.r.o.

   j.  Defendant HC Multimedia LLC with a place of business at 401 Ryland St Ste 200-A, Reno, NV 89502, is owned and/or managed by VS Media, Inc. HC Multimedia LLC attempted to trademark Hidden Cams.

   k.  Robert Seifert has over 60 entities associated with him in the Czech business registry, over half of which are at the same address:  Krakovská 1366/25, Nové Město, 110 00 Prague.  Malorie Deborah Pacaud,[12] also known as Deborah Malorie Pacaud, is associated with over 25 entities at that address, and Stephane Michael Pacaud is associated with 10 entities at this address.

55.   WGCZ operates as a single enterprise with no independent will of their own and simply serves as business conduits and liability shields for the Pacauds. Indeed, they commonly engage in a blatant abuse of the corporate form through

---

[12] Ms. Pacaud sometimes lists her name as Deborah Malorie Pacaud, as well.

repeated corporate shape-shifting:  altering their names, switching directors around, deleting some corporations and forming others, but all remaining under the ultimate control of the Pacauds and a few of their close confidants.

   a.  To take just the example of WebGroup Czech Republic, a.s.: between 2014 and 2017 Stephane Michael Pacaud LK Management Ltd registered and re-registered themselves as owners of WGCZ, s.r.o. numerous times, each time with a change of address and a 1% difference in ownership.

   b.  Then in 2017, WGCZ, s.r.o. becomes a joint stock company, WGCZ, a.s., with Stephane Michael Pacaud and Malorie Deborah Pacaud as the only shareholders.  On information and belief, all of the shares were placed in the same account.

   c.  In 2020, WGCZ, a.s. became WebGroup Czech Republic, a.s., and on August 31, 2021, Malorie Deborah Pacaud was deleted from the board of directors, and Robert Seifert was entered as a board member and deleted as a proxy.

   d.  Another example is that of BangBros, a Miami-based pornography studio. BangBros is owned by Sonesta Technologies, s.r.o., which was registered on July 26, 2017 with Robert Seifert and later Malorie Deborah Pacaud as managing directors.[13]  The company is listed as United Communication Hldg II a.s., which also has Robert Seifert and Malorie Deborah Pacaud as board members.  Seifert and Malorie Deborah Pacaud are also listed as the managing directors for Sonesta Media, s.r.o. and Sonesta Limited, s.r.o. (which owns the BangBros trademarks), and as board members for United Communication Hldg, a.s. and United Communication Holding III, a.s.

---

[13] BangBros.com, Inc. a Florida company, was renamed Sonesta Technologies, Inc. in 2014, with Jeffrey Greenberg and Andrew Hendrixson listed as board members.  Greenberg is a well-known Miami pornographer, who has owned and/or directed both BangBros and Reality Kings.

KAZEROUNI
LAW GROUP, APC

e. Based on the annual report and audit of WGCZ in 2018, WGCZ commingled funds or otherwise had long-term loans with subsidiaries and "related entities", three of which are listed in U.S. currency in their 2018 annual report.



56.     Specifically, an example of commingling the funds with wholly owned subsidiaries, is further illustrated in the report that, when translated, indicates that WGCZ is the exclusive holding of mutual receivables and liabilities from the parent company's loan to individual subsidiaries.  These loans were non-interest bearing and maintained long-term.  On the subsidiaries side, loans are maintained as long-term liabilities to the shareholders.

6. **VYLOUČENÍ VZÁJEMNÝCH VZTAHŮ**

Hlavní úpravou v Holdingu WGCZ je vyloučení vzájemných pohledávek a závazků z titulu půjčky mateřské společnost jednotlivým dcerám. Mateřská společnost má pohledávky. Tyto půjčky nebyly úročeny a jsou vedené jako dlouhodobé, Na straně dcer jsou tyto půjčky vedené jako dlouhodobé závazky ke společníkům.

Seznam vyloučených pohledávek/ závazku na straně dceřiných společností

| Aktiva | WGCZ Holding, a.s. | | | | |
|---|---|---|---|---|---|
| účet | společnost | PZ | MD | DAL | KZ |
| 378200 | Loan Streamfury USD | 111 016 870,00 | 63 679 130,00 | 27 149 370,00 | 147 546 630,00 |
| 378220 | Loan Streamfury CZK | 500 000,00 | - | - | 500 000,00 |
| 378240 | Loan Streamfury EUR | 8 106 000,00 | 24 000,00 | 468 000,00 | 7 662 000,00 |
| 378400 | Loan GTFLIX - USD | 37 176 550,00 | 629 300,00 | 6 933 900,00 | 30 871 950,00 |
| 378500 | Loan DDF Network - EUR | 18 914 000,00 | 56 000,00 | 1 092 000,00 | 17 878 000,00 |
| 378510 | Loan DDF Network - USD | 7 691 700,00 | 130 200,00 | 1 434 600,00 | 6 387 300,00 |
| 378520 | Loan DDF Network - CZK | 1 000 000,00 | - | - | 1 000 000,00 |
| 37x | | 184 405 120,00 | 64 518 630,00 | 37 077 870,00 | 211 845 880,00 |

57.     Further, the 2019 annual report shows the following agreements continued

FIRST AMENDED CLASS ACTION COMPLAINT

and were still in place with wholly owned subsidiaries as well as others related entities.

ztahy mezi propojenými osobami

m účetním období byly mezi Společností a Ovládající osobou nebo mezi Společností a Propojenými
řeny nebo byly v platnosti následující smlouvy:

pojenými osobami:

WGCZ, a.s.

aa) Loan agreement

NKL Associates, s.r.o.

ba) Loan agreement

Streamfury, s.r.o.

ca) Loan agreement

WEB GROUP LIMITED

da) Loan agreement

GTFLIX TV, s.r.o.

ea) Loan agreement

DDF Communication, s.r.o.

fa) Loan agreement

SP Box, s.r.o.

ga) Loan agreement

Content SPV, s.r.o.

ha) Loan agreement

MME Traffic, s.r.o.

a) Contract on clearing centre

58.    In addition to the use of the same corporate officers, similar addresses, WGCZ reported in its 2019 annual report as roughly translated, that the relationship between the Subsidiaries and Related Parties provides advantages for the Company (WGCZ) in particular a significant position in the market, "use of know-how between connected persons, administrative simplification, and optimization of personal resources."    In this period the company (WGCZ) did not incur any loss as a result of the "influence" of related parties.

5.  Zhodnocení výhod a nevýhod plynoucích ze vztahů dle ustanovení § 82 odst. 2 písm. f) a odst. 4
    ZOK

Ze vztahů mezi Propojenými osobami plynou pro Společnost výhody, především významné postavení na trhu,
využití know-how mezi Propojenými osobami, administrativní zjednodušení a optimalizace personálních zdrojů

V Účetním období nevznikla Společnosti žádná újma v důsledku vlivu některé z Propojených osob.

Společnosti neplynou ze vztahů mezi Propojenými osobami žádné nevýhody a ani žádná rizika.

59.     Defendant Stephane Michael Pacaud is, and at all relevant times was, the founder, majority shareholder and an executive of Defendant WebGroup Czech Republic, and its corporate affiliations and alter egos. Mr. Pacaud, along with his sister Defendant Malorie Deborah Pacaud, founded and developed WebGroup Czech from its inception and is a primary decision maker with knowledge and control over all aspects of the corporation and its corporate affiliations and alter egos. Mr. Pacaud's last known residence listed on the Czech business database for WebGroup Czech is Saint Germain au Mont d'Or, 1 Chemin De La Mendillonne, French Republic.

60.     Defendant Malorie Deborah Pacaud is, and at all relevant times was, a shareholder and an executive of Defendant WebGroup Czech Republic, and its corporate affiliations and alter egos. Ms. Pacaud, along with her brother, Defendant Stephane Michael Pacaud, founded and developed WebGroup Czech from its inception and is a primary decision maker with knowledge and control over all aspects of the corporation and its corporate affiliations and alter egos. Ms. Pacaud's last known residence listed on the Czech business database for WebGroup Czech is Krakovska 593/19, Nové Město, 100 00 Prague 1.

61.     Each of the WGCZ Defendants are related corporations that operate as a single enterprise, act as the alter egos of the others, and essentially as mere conduits whose actions were controlled and ratified by the principals the Pacauds. The WGCZ entities have created a complex corporate structure designed to operate interactive commercial websites, offer memberships, create content, and transact other related business throughout the world and the United States, including specific business contacts with persons in California.

62.     ServerStack, Inc. is a wholly owned subsidiary of Digital Ocean, Inc., and at all relevant times was, a corporation existing under the laws of Delaware as a Domestic Business, and having its registered agent Corporation Service Company located at 80 State Street, Albany, New York 12207-2543 and its principal place of business at 101 Avenue of the Americas, 10th floor, New York, New York, 10013.

ServerStack is doing business in California through its data center located in San Jose, California.

63.    Digital Ocean Holdings, Inc. is, and at all relevant times was, the ultimate parent company of Digital Ocean, LLC and Server Stack, Inc., and is a corporation existing under the laws of Delaware, having a principal place of business at 101 Avenue of the Americas, 10th floor, New York, New York, 10013, and its registered agent, Corporation Service Company at 80 State Street, Albany, New York 12207. According to its website, Digital Ocean maintains a branch and is doing business in California.

64.    Digital Ocean, LLC, f/k/a Digital Ocean, Inc, is a wholly owned subsidiary of Digital Holdings, Inc. Digital Ocean, Inc., was organized under the laws of Delaware in 2012, having a principal place of business at 101 Avenue of the Americas, 10th Floor, New York, New York, 10013, until it was reorganized as Digital Ocean, LLC., a foreign limited liability company, with its registered agent at Corporation Service Company, 80 State Street, Albany, New York 12207. According to its website, Digital Ocean is doing business at its California branch.[14]

65.    Defendants ServerStack, Digital Ocean Holdings, Inc., and Digital Ocean, LLC, f/k/a Digital Ocean, Inc., hereinafter will be collectively referred to as the "Server Defendants".

66.    The Defendants conspired, facilitated, and financially benefited from participating in a venture they knew or should have known was child sex trafficking and exploitation. In these ventures, Jane Doe and other minors were trafficked and commercially exploited for sex, in violation of law, including but not limited to, the TVPRA, 18 U.S.C. § 1591, *et seq*.

---

[14] *See*, https://docs.digitalocean.com/products/platform/availability-matrix/

67.    Defendants, through the development and active management of the XVideos website enterprise, knowingly benefited and profited from commercial sex acts, child pornography, and sex trafficking involving the Plaintiff and Class members.

## **Alter Ego and Joint Tortfeasors**

### *The WGCZ Defendants*

68.    The WGCZ Defendants are alter egos, representatives, agents, or co-conspirators of Defendants WGCZ and its principals the Pacauds.  Defendant WGCZ along with the Pacauds exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the WGCZ Defendants.

69.    WGCZ Defendants, and the two individual Pacaud Defendants are a single and joint employer with a high degree of interrelated, intermingled, and unified operations for the pornography sites used to benefit from Plaintiff's trafficking.

70.    The WGCZ Defendants lack any material independence as corporate entities.  They are operated by the Pacauds as a single enterprise with WebGroup Czech Republic directing the operations and financial policies of all of the WGCZ Defendants such that they are merely business conduits for the Pacauds, using integrated resources in pursuit of a single business purpose.

71.    WGCZ Defendants created a sham to perpetrate fraud and avoid liability and as stated below have failed to observe corporate formalities.

72.    WGCZ Defendants, and the two Pacaud Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

73.    As an integrated enterprise and or joint employer, WGCZ Defendants, and the two Pacaud Defendants are separately and jointly responsible for compliance with all applicable laws.

74.    As an integrated enterprise, WGCZ Defendants, and the two Pacaud Defendants are jointly and severally liable for any damages.

*The Server Defendants*

75.    WGCZ partnered with ServerStack to help grow their business by providing growth consulting services, developing a full service infrastructure and active management services for the XVideos site which included analyzing content, indexing and categorizing data, developing and offering content to assist advertisers and sophisticated software development to maximize XVideos growth and profit.

76.    In 2004, ServerStack, Inc. was created by Ben Uretsky with offices located in New York.

77.    As identified on ServerStack's website,[15]  ServerStack's network and servers physically reside in New Jersey, San Jose, CA, and Amsterdam.

78.    ServerStack reported running tests at their facilities in the metro area of San Jose, California.

79.    At least by 2008, ServerStack became a server host provider for the XVideos website enterprise, including domains and affiliates and, as of 2010, became the server host provider, and currently maintains that status. ServerStack is the sole server analyzing new uploads, including the programming, changing, flagging, and deleting of CSAM.

80.    In 2013, ServerStack was bought by DigitalOcean, Inc. and continued to be wholly owned, operated, and controlled by DigitalOcean, Inc., until DigitalOcean, Inc. was terminated, and reorganized, and relabeled into Digital Ocean, LLC and Digital Ocean Holdings, Inc.

81.    During reorganization in February 2018, Ben Uretsky, the owner, CEO, and creator of ServerStack and DigitalOcean, Inc. formed the ultimate parent company, Digital Ocean Holdings, Inc.

82.    Ben Uretsky described the partnership with its website clients as follows:

> [T]he first company that I started was called ServerStack... we monitored and took care of that entire environment, provided a 100% uptime SLA,

---

[15] *See*, https://www.serverstack.com/

took care of back up security, capacity planning, network expansion, *just everything that falls within IT management and helped our customers grow their business*. And so what was great about that business was that as you sign up that first customer, more often than not, they continued to grow their business, so each month, each account produces more revenue and the goal is to get as many more accounts as you can.[16]

83.   ServerStack ceased operating independently of DigitalOcean when it was purchased in 2013.  ServerStack's website, blog, Twitter account, and Facebook page appear to have been abandoned and have not been updated with any new information or marketing materials since 2013.[17]  Essentially, upon information and belief, ServerStack is a shell company wholly operated and controlled by Digital Ocean Holdings, Inc., a California corporation.

84.   Upon information and belief, communications with ServerStack necessarily go to DigitalOcean in California.

85.   Server providers, including DigitalOcean doing business as ServerStack, are required by ICANN and ARIN to register abuse contact information for content on related IP addresses.

86.   The IP addresses for ServerStack, Inc. includes a block of IP ranges for DigitalOcean.[18]

---

[16] *See*, https://www.cleverism.com/digitalocean-interview-ceo-ben-uretsky/.
[17] *See*, https://www.serverstack.com/tour.html.
[18] *See*, ipinfo.io/AS452

**IP Address Ranges**

IPv4 Ranges    IPv6 Ranges

| NETBLOCK | COMPANY | NUM OF IPS |
|---|---|---|
| 141.0.168.0/24 | Amsterdam ServerStack | 256 |
| 141.0.171.0/24 | Amsterdam ServerStack | 256 |
| 141.0.172.0/22 | Amsterdam ServerStack | 1,024 |
| 141.0.174.0/24 | Amsterdam ServerStack | 256 |
| 185.88.180.0/22 | ServerStack, Inc. | 1,024 |
| 199.4.223.0/24 | DigitalOcean, LLC | 256 |
| 69.55.48.0/24 | ServerStack, Inc. | 256 |
| 69.55.50.0/24 | ServerStack, Inc. | 256 |
| 69.55.51.0/24 | ServerStack, Inc. | 256 |
| 69.55.52.0/24 | ServerStack, Inc. | 256 |

Show more IP ranges

87.     As identified within the data at the office of the IP registrar, if someone wanted to report CSAM or sex trafficking for the XVideos website enterprise, upon information and belief, they could go to the registrar website and report to ServerStack at either abuse@serverstack.com or Abuse@digitalocean.com.

88.     The latest block of IP addresses requested for ServerStack and XVideos website content were relabeled for DigitalOcean, Inc.  Currently, the XVideos website enterprise is being maintained by ServerStack/Digital Ocean under the following domains:

FIRST AMENDED CLASS ACTION COMPLAINT

**Hosted Domains**

There are 920 domain names hosted across 31 IP addresses on this ASN. Checkout our API to access full domain hosting information.

| IP ADDRESS | DOMAIN | DOMAINS ON THIS IP |
|---|---|---|
| 185.88.181.59 | xnxx.com | 109 |
| 185.88.181.58 | xnxx.com | 107 |
| 185.88.181.60 | xnxx.com | 105 |
| 185.88.181.53 | xnxx.com | 104 |
| 185.88.181.54 | xnxx.com | 96 |
| 185.88.181.57 | xnxx.com | 90 |
| 185.88.181.55 | xnxx.com | 86 |
| 185.88.181.9 | xvideos.com | 78 |
| 185.88.181.4 | xvideos.com | 77 |
| 185.88.181.56 | xnxx.com | 77 |

89.    DNSDumpster.com indicates that significant servers for the XVideos website enterprise are being maintained in the United States.



FIRST AMENDED CLASS ACTION COMPLAINT

90.     Upon information and belief, given the longstanding history of the labeling of ServerStack and its association with WGCZ, ServerStack was not relabeled to Digital Ocean Holdings, Inc.

91.     ServerStack and DigitalOcean, LLC share executives, operations, office space, and employees.

92.     Limelight Network has contracted with DigitalOcean/ServerStack to be a content delivery network (CDN), which likely means that additional servers are located throughout the United States.  CDNs work to take a copy of the original uploaded information on the site and original server with ServerStack and copies them so that content may be organized and located in such a manner to get it physically closer to the person searching for it -  CDNs make your site and searching move faster.

93.     Digital Ocean Holdings, Inc. exercises and has the right to exercise control over business operations, management, supervision, administration, and procedures of ServerStack.

94.     During the time period relevant to the allegations contained herein, the Server Defendants were in an agency relationship created through one or more of the following actions:

    a.  sharing profits,

    b.  standardized operations, policy, and training methods for employees;

    c.   sharing executive officer, Ben Uretsky;

    d.  sharing executive office locations in New York;

    e.  building and maintaining ServerStack, Inc. owned and operated by Digital Ocean Holdings, Inc. in a manner specified by Defendant Digital Ocean Holdings, Inc.;

    f.  standardized rules of operation;

    g.  regular inspection of the data being reviewed, stored, optimized, processed, stored;

    h.  prices and expenses fixed by Defendant Digital Ocean Holdings, Inc; or

i. any actions that deprive ServerStack of independence in business operations.

95. Server Defendants are a single and joint employer with a high degree of interrelated, intermingled, and unified operations.

96. Server Defendants jointly employ or ratify the employment of individuals through horizontal joint employment or vertical joint employment.

97. As an integrated enterprise or joint employer, Server Defendants are separately and jointly responsible for compliance with all applicable laws.

98. As an integrated enterprise and or joint employer, Server Defendants are jointly and severally liable for any damages caused by employees.

## FACTUAL ALLEGATIONS

### Sex trafficking minors, including through pornography, violates federal law

99. The United States Department of Justice estimates that pornographers have recorded the abuse of more than one million children in the United States.[19] The Internet has radically changed how child pornography is reproduced and disseminated: "The expansion of the Internet has led to an explosion in the market for child pornography, making it easier to create, access, and distribute these images of abuse. While 'child pornography' is the term commonly used by lawmakers, prosecutors, investigators and the public to describe this form of sexual exploitation of children, that term largely fails to describe the true horror that is faced by hundreds of thousands of children every year. The child victims are first sexually assaulted in order to produce the vile, and often violent, images. They are then victimized again when these images of their sexual assault are traded over the Internet in massive numbers by like-minded people across the globe."[20]

---

[19] Roger J.R. Levesque, Sexual Abuse of Children: A Human Rights Perspective, at 66 (Ind. Univ. Press 1999).
[20] *See*, https://www.justice.gov/psc/docs/natstrategyreport.pdf.

100.   In the United States, the National Center for Missing and Exploited Children ("NCMEC") serves as the national clearinghouse for child pornography/child sexual abuse material reports.   NCMEC was created by an Act of Congress and is federally funded.   NCMEC operates the "CyberTipline," which gathers child sexual exploitation reports (including child pornography, online enticement, and contact offenses). Individuals and electronic service providers ("ESPs") may report incidents of suspected child sex trafficking or child sexual abuse images to the CyberTipline. In 2019, the CyberTipline processed 16.9 million reports and approximately 21 million reports in 2020. NCMEC also operates the U.S. Child Victim Identification Program and, as of 2019, it had reviewed more than 312 million images and videos of child sexual abuse material.[21]

101.   Through NCMEC's database, more than 13,200 child victims have been identified by law enforcement.

102.   In 2000, Congress passed the Trafficking Victims Protection Act ("TVPA"). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses,[22] including sex trafficking of children under the age of 18 and sex trafficking by force, fraud, or coercion.[23]

103.   Congress reauthorized the TVPA in 2003 and created a civil cause of action, codified at 18 U.S.C. § 1595.[24]

104.   The TVPRA, as amended in 2008, improved a victim's ability to hold traffickers accountable, by eliminating the requirement to prove a particular defendant knew a sex trafficking victim was a minor, in cases where the defendant had a

---

[21] Child Sexual Abuse Material (CSAM), National Center for Missing & Exploited Children, https://www.missingkids.org/theissues/csam (last visited Feb. 8, 2021).

[22] *See* Victims of Trafficking and Violence Protection Act of 2000. Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1467(2000), *available at* https://www.congress.gov/106/plaws/publ386/PLAW-106publ386.pdf.

[23] *See* 18 U.S.C. § 1591(a), *available at* https://www.law.cornell.edu/uscode/text/18/1591

[24] *See* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003), *available at* https://www.gpo.gov/fdsys/pkg/STATUTE-117/pdf/STATUTE-117-Pg2875.pdf

reasonable opportunity to observe the minor.  The TVPRA also significantly expanded the civil cause of action and extended liability to those who financially benefit from sex trafficking.

105.   The TVPRA permits civil claims against perpetrators and against those who, although not direct perpetrators, knowingly benefit from participating in what they knew or should have known was a sex trafficking venture.[25]

106.   The revised civil remedy provision allows sex trafficking survivors sue anyone who benefits financially or receives anything of value from the violation. Survivors may sue the direct perpetrator *as well as anyone else* who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of [the statute.]"  18 U.S.C. § 1595(a) (emphasis added).

107.   Under 18 U.S.C. § 1591(e)(3) the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

108.   Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value, from participation in a venture which knowingly recruits, entices, harbors, transports, provides, obtains, maintains, advertises, patronizes, or solicits by any means a commercial sex act involving a person who is under 18 years old or a person induced by force, fraud, or coercion.[26]   18 U.S.C. § 1591(a)(1).  Section 1591(a)(2) also makes it a crime to knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the acts described in § 1591(a)(1).

109.   Courts in this circuit have found that, "posting child pornography is a commercial sex act." *Doe v. MindGeek USA Incorp. et al.,* Case No.: SACV 21-00338-

---

[25] *Id.*

[26] Except for advertising offenses, "reckless disregard of the fact[s]" is a sufficient *mens rea* for any of these crimes. 18 U.S.C. § 1591(a).

1    CJC (ADSx), slip op. at 16 (C.D. Cal. Sept. 8, 2021); *see also Doe v. Twitter,* 2021 WL

2    3675207, at * 27 (N.D. Cal. Aug. 19, 2021).

3        110.   In 2018, Congress passed a bill known as Fight Online Sex Trafficking

4    Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively,

5    "FOSTA/SESTA") to amend 47 U.S.C. § 230, the Communications Decency Act, to

6    clarify that it was never intended to provide immunity from civil lawsuits for websites

7    that facilitate or profit from sex trafficking.[27]   The FOSTA/SESTA amendment to

8    Section 230 is retroactive, applying "regardless of whether the conduct alleged

9    occurred, or is alleged to have occurred, before, on, or after … enactment."[28]

10       111.   Plaintiff and the Class Members are sex trafficking victims under 18

11   U.S.C. § 1591 and are therefore entitled to bring a civil action and seek redress under

12   18 U.S.C. § 1595.

13       112.   On January 31, 2020, Executive Order #13903, entitled "Combating

14   Human Trafficking and Online Child Exploitation in the United States" was issued.[29]

15   The Order stated: "Human trafficking is a form of modern slavery. Throughout the

16   United States and around the world, human trafficking tears apart communities, fuels

17   criminal activity, and threatens the national security of the United States. It is estimated

18   that millions of individuals are trafficked around the world each year—including into

19   and within the United States." It further stated: "Twenty-first century technology and

20   the proliferation of the internet and mobile devices have helped facilitate the crime of

21   child sex trafficking and other forms of child exploitation. Consequently, the number

22   of reports to the National Center for Missing and Exploited Children of online photos

23   and videos of children being sexually abused is at record levels."

24

25   _____

26   [27] Pub. L. 115–164, §2, Apr. 11, 2018, 132 Stat. 1253

27   [28] *See*, 132 Stat. 1253, §4(b); *see also* Woodhull Freedom Found v. United States, No. 18-5298, 2020 WL 398625 (D.C. Cir., June 24, 2020).

28   [29] Exec. Order No. 13903, 85 FR 6721, 6721-6723 (Jan. 31, 2020), *available at* https://www.federalregister.gov/documents/2020/02/05/2020-02438/combating-human-trafficking-and-online-child-exploitation-in-the-united-states.

KAZEROUNI
LAW GROUP, APC

*WGCZ Entities facilitate and profit from sex trafficking of minors*

113.   The WGCZ Defendants own and operate a large number of websites including two major "tube-sites" -- www.XVideos.com ("XVideos") and www.xnxx.com ("XNXX") -- which WGCZ Defendants boast are "the most visited adult porn tubes on the planet."[30]

114.   WGCZ boasts it has 200 million daily visitors and 6 billion daily impressions on its various websites from which it has consolidated production and distribution.[31]

115.   As of January 2021, XVideos is the most popular pornography website in the world and the 7th most popular website in the world, visited more than Netflix, Amazon, and Wikipedia,[32] with over 3 billion visits a month.[33] WGCZ's second most popular website, XNXX, is the 9th most visited website in the world and together these two websites garner over 5 billion visits a month,[34] double the traffic of their biggest competitor, Pornhub.[35]

116.   WGCZ receives between 1,200 to 2,000 videos to its websites every day.

117.   Traffic Factory is a web advertising and digital marketing company created by WGCZ, and owned by Traffic F, s.r.o., for use on XVideos and other WGCZ-owned sites.  WGCZ's revenue model is based in part on being able to sell ads to advertisers.

118.   Unlike other video websites such as YouTube, WGCZ's websites also include a download button for transferring images and videos, including the child sexual abuse material appearing on the WGCZ Defendants' websites, from their

---

[30] *See*, https://porn.work/en/ (last visited Feb. 21, 2021).
[31] *See*, https://www.trafficfactory.com/wp-content/uploads/2019/09/TRAFFIC-FACTORY-MEDIA-KIT-ENGLISH.pdf
[32] *See*, https://www.similarweb.com/top-websites/.
[33] *See*, https://www.similarweb.com/website/xvideos.com/.
[34] *See*, https://www.similarweb.com/website/xnxx.com/.
[35] *See*, https://www.similarweb.com/website/pornhub.com/#overview.

servers to an undisclosed number of child pornographers, child sex traffickers, and pedophiles.

119.   WGCZ permits easy access to its XVideos site and encourages users to create their own sites and use the existing 7,000,000 videos with video URL, thumbnail URL, tags, duration, title, and embedded code to do so.[36] As recently as 2018, WGCZ invited XVideos users taking advantage of this feature to subscribe to their "updates feed" so that new videos could be quickly distributed from the XVideos site directly to the subscriber noting, "There are over 5000 videos added every day. It can go up to 10000 videos uploaded in a single day."[37]



120.   Users consuming content on XVideos have several options: (1) access the site for free without creating an account; (2) create an account and receive a variety of WGCZ developed, generated and controlled benefits or partner programs; or (3) pay for a premium Red Service account, which is managed, operated and controlled by WGCZ.

121.   Users uploading content on XVideos also have several options: (1) create an account and upload content without making any money; (2) create an account and

---

[36] *See*, https://info.xvideos.com/db
[37] *Id*.

FIRST AMENDED CLASS ACTION COMPLAINT

"verify" (upload a video of yourself) to upload videos while disguised behind a VPN; and (3) upgrade to a "channel" (upload three high quality videos of a certain length) account to monetize videos.

122. There is a stated requirement that the account holder be at least 18 years old, but there is no process to verify this.

123. Any account holder can upload videos without verification of any kind.[38]

124. The process to become "verified", which comes with additional benefits, does not verify age or consent but merely whether the account holder appears in the content. This process consists of submitting a video in which "You do not necessarily have to show your face but it must be enough of you to prove that the content under your account is clearly yours. . . . The video must also be related to XVIDEOS in some way. You can have XVIDEOS written on your body, or you can talk about XVIDEOS (a simple "I am on XVIDEOS" is fine). . . . Feel free to be creative. We are not strict on what we want to see, as long as it matches your uploads. We like good ones and may promote them to the front page."[39]



125. XVideos users that have "verified" by uploading a video can participate in a XVideos unique chat system and upload videos while disguising their identities

---

[38] *See*, https://info.xvideos.com/account-status.
[39] *See*, https://www.xvideos.com/account/verify-profile.

through a virtual private network ("VPN").  The XVideos site is sophisticated enough to determine whether someone entering their site is doing so by VPN as well as whether the IP address or account code was obtained from a server farm or illegitimate or non-traceable account.

126.   The content partner program offers the pornographer various methods to upload content and create revenue based on views.  From the XVideos site, a user can select the WGCZ-created link for "RED videos," XVideos premium content, and various "channels" hosting WGCZ-controlled content, including from content partners.

127.   To join the content partner program, a user must create an XVideos account (which requires only a valid email address), "verify" the account, and then set up a "channel" by uploading three or more videos.[40]

128.   For studio/production companies, the "verification" standard is even lower. WGCZ's site currently instructs them to either "ignore the verification process" or "call us directly."[41]



---

[40] *See*, https://info.xvideos.com/cpp.

[41] Although the verification screenshot above shows information dated from 2018, it still appears on the XVideos account dashboard as a current set of requirements.

129.   The XVideos site is sophisticated enough to determine whether someone entering their site is doing so by VPN as well as whether the IP address or account code was obtained from a server farm or illegitimate or non-traceable account.

130.   The abysmal "verification process" only applies to the account holder/uploader. If a video posted by a verified account includes other parties or individuals, WGCZ has no process to "verify" those parties and accordingly makes no attempt to verify their age.   Once an account has been verified, they can apply to become a Channel -- which opens the door to monetization. A user who creates a channel on XVideos can "promote [their] brand through various ads and links"[42] and their videos can be monetized.[43] WGCZ promotes and profits from these partner channels including verified partner channels that distributed Plaintiff's abuse videos.

131.   Further, the site, acknowledging that account holders are not required to verify the participants in the video, indicates "you might get banned if you upload from multiple accounts"; however, it is policy without substance because it is impossible for XVideos to trace the true IP address because the site allows users to access videos through a VPN which hides the true geographic location of the user's IP address.

132.   WGCZ reviews, monitors, and approves incoming videos to determine whether the videos may be posted to channel accounts.  Further, WGCZ reviews videos to confirm whether the video is of "decent quality" defined as "no close ups, bad lighting or shaking camera" and of adequate length such that each of the three required videos for a channel account must be "longer than five minutes."[44]  WGCZ reviews videos and cautions that "if you are stealing content, please don't bother. We will verify." However, there is no age or consent verification involved in being granted Channel status on the site.

---

[42] *See,* https://info.xvideos.com/cpp.
[43] *See,* https://info.xvideos.com/account-status.
[44] *See*, https://info.xvideos.com/cpp.

FIRST AMENDED CLASS ACTION COMPLAINT

133.    Channel partners are offered a variety of benefits by WGCZ, including "dedicated channel support services," "priority feature on the home page," "monetization of your free uploads," "monetization of your premium uploads," "piracy prevention with digital fingerprinting," "more detailed statistics for your video uploads," "ability to claim pirated videos," and "link to your channel if a model worked for you," among other benefits.[45]

134.    Through this monetization scheme, and exchange of benefits, WGCZ maintains continuous business relationships with, and is in a profit-sharing relationship with, Channel Partners.

135.    These profit-sharing relationships include sex traffickers, such as the Channel partner who distributed Jane Doe's abuse videos on the XVideos and XNXX websites.

136.    WGCZ places advertisements before videos play, underneath videos, and around videos.

137.    WGCZ thus profits from images and videos of commercial sex acts, including the sexual abuse and rape of children.  This profit-making activity included the Plaintiff's rape.

138.    WGCZ generates, originates, creates, or otherwise edits tags associated with videos loaded onto its website. Tags are keywords associated with a video and are used to optimize search features on the XVideos website, which ultimately increases views, downloads, and the success of targeted advertising by Traffic Factory.

139.    Tags, categories, and search suggestions that have been reviewed, categorized, created and/or edited by WGCZ help users locate the type of video they are searching for, including child pornography, child sex trafficking, or any other child sexual abuse material.

---

[45] *See*, https://info.xvideos.com/account-status.

KAZEROUNI
LAW GROUP, APC

140.   The optimization, logic, tags and/or search terms created by WGCZ automatically presents users with  "related searches" like "jailbait," "not 18," "flat hairless," "innocent little young girl," "cheese pizza," "how old is she," and "elementary," and more than 20 other "related searches" where videos had been tagged or indexed with similar horrifying terms, some even in foreign languages, suggesting child pornography, sex trafficking, and rape of children.

141.   One such tag WGCZ used to classify pornographic content on its XVideos website is "toddler."

142.   In short, WGCZ's creation and continued compilation of "related search terms" and tags directly facilitates pedophiles finding the exact content they want: child sexual abuse material, including that of the Plaintiff.

143.   WGCZ creates, manipulates and maintains statuses and indexes for account holders, allowing users to locate each other in a verified user index based on information provided at account creation. Uploaders that are monetizing their videos get additional benefits, including (1) priority appearance over other users; (2) appearance in a "pornstar" index; and (3) appearance in an index ranking "models."

144.   Another optimizing feature XVideos performs for its users is creating and controlling thumbnail images and preview videos for uploaded videos.  Thumbnail images are preview images that show a particular scene from an uploaded video to a user browsing the site. If a user places their mouse over a video, they are shown additional thumbnail images or a preview video. Thumbnail images and preview videos are created and displayed to increase traffic to a particular video and generate additional revenue.  XVideos produces and controls thumbnail images and preview videos for uploaded videos. In some cases, uploaders that are monetizing videos are allowed to select from four XVideos provided thumbnail images for a limited time after uploading. XVideos chooses the additional thumbnails and preview videos that appear when users hover over a video.

145.   The XVideos site facilitates and assists pedophiles and criminals to communicate with providers of victims, through its chat system embedded on WGCZ's XVideos website. This unique communication system allows account holders and users to remain virtually anonymous while posting images and videos.

146.   The WGCZ communication system combined with the enormous reach and popularity of its website allowed sex traffickers to market sex trafficking victims, including minors, and connect illegal sex providers and buyers in an anonymous fashion. Because WGCZ controls the communication system, and allows "verified" users to disguise themselves through a VPN service, the exact location and identities of those who upload videos can be hidden from law enforcement and other agencies responsible for exploited minors.

147.   WGCZ facilitates sex traffickers, rapists, or other would-be criminals to go undetected while profiting, along with the Defendants, from their victims' abuse and trafficking.

148.   While creating hashtags and an anonymous chat function that facilitates the uploading of illegal content on its site, WGCZ then completely fails to control the resulting torrent of videos available on its sites depicting children being molested, rapes of children and adults, persons who are incapacitated and otherwise unwilling participants.

149.   Despite the ability to do so, WGCZ refuses to monitor or control who is posting or present in videos on its websites.

150.   Minor victims of sex trafficking and their representatives have contacted WGCZ to remove videos of them from its websites, but WGCZ has refused to do so. Thus, WGCZ is knowingly in possession of child pornography and is allowing its distribution for profit.[46]

---

[46] *See*, https://www.nytimes.com/2021/04/16/opinion/sunday/companies-online-rape-videos.html.

151.   WGCZ production studio BangBros has filmed, produced, and distributed child pornography with at least one minor.[47]

152.   On information and belief, WGCZ entity member/manager Miroslav Mrna directs and/or controls a sex trafficking venture involving pornography performers that spans several countries, including the Czech Republic, Romania, and Colombia.

153.   On information and belief, VS Media, Inc., California-based employees Brad Estes and Jamie Rodriguez are co-conspirators in Miroslav Mrna's sex trafficking venture.

154.   On information and belief, the Legal Porno studio owned and/or controlled by WGCZ entity GTFlix TV, s.r.o. has used force, fraud, and coercion against women performers, who were severely injured by the extreme and violent nature of the pornography filming, including one who had to be hospitalized[48].

155.   As of December 2020, WGCZ, was not registered as an ESP with the National Center on Missing and Exploited Children (NCMEC) to report child pornography and child sex trafficking, on its site(s). Upon information and belief, WGCZ fails to report at least some material it knows is child pornography to NCMEC and/or similar entities and/or law enforcement, even when WGCZ removes such material.

156.   The content WGCZ creates relies on data gathered from its users' habits to highlight new trends, compare viewing habits of users in different cities or regions, and generally parse the online behavior of its millions of consumers.

157.   WGCZ harnesses the data it compiles and analyzes to write scripts and specify details, including dialogue, positions, sex acts, and camera angles in those video shoots. The level of detail illustrates the impact of WGCZ's analysis of user data

---

[47] *See*, https://www.browardpalmbeach.com/news/bangbros-accused-of-underage-porn-6352636.
[48] *See*, https://denikn.cz/552186/i-was-bleeding-and-ended-up-in-hospital-women-accuse-producers-of-xvideos-of-violent-porn-shooting/?ref=suv.

1  on WGCZ's content creation process. WGCZ caters to fetishes and incorporates and
2  highlights elements of the videos on its websites based on user data. WGCZ's
3  leadership has stressed that content choices reflect the data mining of millions of views,
4  which allows WGCZ to determine what variables produce the highest viewership.
5  WGCZ's data analyses are used to determine, create, and place content, including child
6  sexual abuse material, on its websites.

7       158.   WGCZ also uses data from its billions of monthly views to make decisions
8  about specific features of the content it creates and curates on its various websites.
9  WGCZ suggests to users what other content a particular user might like based on prior
10 viewing, and categorizes all material on its websites, including the child sexual abuse
11 material, based on widely-searched terms. WGCZ leverages its user data to shape the
12 particulars of content and drive user engagement.

13      159.   WGCZ does not require age verification to create an account and upload
14 videos. Worse, WGCZ created a "verification" process that allows users that wish to
15 disguise their locations and IP addresses to use a VPN while creating an account and
16 uploading content.

17      160.   Traffic Factory is a web advertising and digital marketing company
18 created by WGCZ for use on its XVideos site and also maintained by Server
19 Defendants.[49]

20      161.   WGCZ's revenue model includes being able to sell ads to advertisers.  If
21 users are searching for a term frequently then WGCZ can produce or tag materials
22 based on frequent search terms by the users.  Upon information and belief, WGCZ edits
23 advertisements placed on its website and, through Traffic Factory, facilitates data-
24 driven decisions about advertising content.  These ads frequently highlight search terms
25 like "teen" and "toddler" which promote the use and creation of child sexual abuse
26 materials.

27

28

---

[49] *See*, https://www.trafficfactory.com/index.html.

162.   Upon information and belief, WGCZ developed ads and affirmatively chose the content characteristics and categories to target users and direct ads.

163.   WGCZ is responsible, in whole or in part, for developing and creating guidelines which permit, promote, and encourage sex trafficking and child pornography on its website, XVideos.  WGCZ facilitates and assists traffickers and child pornography purchasers through its account creation, advertising placement, content organization, tagging, and other optimization, content production, and data mining.

***Server Defendants facilitate and profit from sex trafficking of minors, including Jane Doe***

164.   ServerStack currently hosts the website XVideos.com and its related pornography affiliates, including but not limited to XNXX.com and the marketing arm of XVideos.com, Traffic Factory.



165.   ServerStack, through Digital Ocean Holdings, is more than just a dormant server hosting backup storage.  The Server Defendants are interactive partners with XVideos.com.  ServerStack boasts that it scaled "a website's infrastructure to serve 150 million pageviews per day through a "single managed dedicated server."  Upon information and belief, the partnership and business growth mentioned in that boast is that of XVideos.com.

166.   ServerStack boasts that it maintains fully managed servers for its clients to support and optimize usage. ServerStack's services include creating and managing server infrastructure for each individual XVideo website components, such as the comment system, the video players, and search tools.  Upon information and belief, these processes optimize and manipulate data, increase revenue, and promote

interaction with child pornography, including that depicting Plaintiff and other class members.

167.   A key function of XVideos is receiving and encoding videos from users. Encoding a video converts it to a format suitable for the XVideos video player. This process also allows XVideos to manipulate, review, and edit videos to capture, create, and publish thumbnail images, including videos of Plaintiff and other minors.

168.   Video encoding, thumbnail creation, and video playing are critical functions provided by ServerStack's application servers for XVideos.

169.   Generally, searching a website requires that website to be indexed, a process that gathers, organizes, and creates information about each video. That information is set up in a format that responds to searches by users quickly and efficiently. Searching and indexing are also critical functions provided by ServerStack's application servers for XVideos, to support its video search tool.

170.   Key XVideos functions also include commenting on individual videos and chat services. There are millions of comments on XVideos, and XVideos chatting services include direct, non-public, user to user image sharing, between tens of thousands of users on the site. These commenting and chatting services are critical functions provided by ServerStack's application servers for XVideos.

171.   ServerStack, through Digital Ocean, actively manages the XVideos website. Without this active management, XVideos would routinely stop functioning. In other words, upon information and belief, ServerStack, through DigitalOcean, does not operate as a stagnant server host, instead, they must actively review and understand the content so that they can scale the website as a whole, including changing the quality of video uploads to maintain loading times and speed of searching, understanding terms that are being searched for so that advertisements are appropriately worded, placed and are successful to generate additional revenue.

172.    ServerStack and DigitalOcean necessarily control any CSAM content on its website, including Plaintiff's videos.  Victims of CSAM, including Plaintiff, can notify XVideos, ServerStack or DigitalOcean with notice of abuse.

173.    As alleged below, Plaintiff notified XVideos and requested removal of the video depicting her.  XVideos would and should have notified the Server Defendants, who would have had the ability to capture, mark, identify, remove and report said videos.  Instead, the videos remained on the website and server, where viewing and monetizing continued.

174.    To draw in new users and maintain market share, WGCZ working together with Server Defendants make most of its library available for free, even without creating an account.  In this way, WGCZ through Server Defendants distributes content -- including child pornography -- to anyone.

175.    Users can access as much pornography as they like without creating an account.  WGCZ analyzes and optimizes user data to subtly lead viewers to create accounts for user convenience.  This permits WGCZ to better track and understand what users like.  WGCZ uses the data to facilitate and route viewers to increased engagement with the platform and leads viewers to paid subscriptions offering premium content reflecting the viewer's preferences, even if that content involves child rape, pornography, or other rapes.

176.    WGCZ sells its Red Service subscription which enables users to "download videos in HD" and "chat with other users through the [private] VPN system" and other benefits all managed, maintained, and facilitated by WGCZ for a profit.

177.    WGCZ's "content program" pays "millions a year to content providers." Account holders on its model or channel split profits with WGCZ through: (1) advertisement income sharing; (2) revenue sharing; and (3) XVideos red share accounts.

178.   WGCZ is generating millions in advertising and membership revenue, applies sophisticated data analytics to troll and monitor its users; and yet refuses to verify the age or consent of those featured in the pornographic content, or most importantly prevent sex trafficking of the most vulnerable victims whose bodies have been sold for profit.

179.   Upon information and belief, ServerStack provides at least one dedicated employee to manage, manipulate, and strategize opportunities to "help grow the XVideo business."

180.   Upon information and belief, ServerStack provides the infrastructure and was the mastermind behind interactive features like the unique, exclusive, and internal communication systems within XVideos.

181.   In the last two years, Digital Ocean reported more than 75 instances of child pornography to the National Center for Missing & Exploited Children.[50]

182.   WGCZ and Server Defendants actively control how videos are posted; the discussions/comments surrounding particular videos and images; processes for viewing, posting, and creating accounts; and processes for encouraging and rewarding income and fees for downloaded and viewed content.

183.   Upon information and belief, Server Defendants assist WGCZ in customizing how: (1) videos are posted; (2) the discussions/comments surrounding particular videos and images; (3) content consumers and posters view, post, and create accounts; and (4) to monetize viewed and downloaded content.

184.   WGCZ and Server Defendants work together to optimize data to steer viewers toward content that they seek the most.  More user engagement means more profit.  More views means more money.

***Traffic Factory - Alter Ego of WGCZ***

---

[50] National Center for Missing & Exploited Children, 2019 and 2020 Reports provided by Electronic Service Providers. https://www.missingkids.org/gethelpnow/cybertipline

185.     Traffic Factory is a web advertising and digital marketing company created by WGCZ for use on its XVideos site and also maintained by Server Defendants.[51]

186.     WGCZ's revenue model includes being able to sell ads to advertisers. If users are searching for a term frequently then WGCZ can produce or tag materials based on frequent search terms by the users. Upon information and belief, WGCZ edits advertisements placed on its website and, through Traffic Factory, facilitates data-driven decisions about advertising content. These ads frequently highlight search terms like "teen" and "toddler" which promote the use and creation of child sexual abuse materials.

187.   Upon information and belief, WGCZ developed ads and affirmatively chose the content characteristics and categories to target users and direct ads.

### *Sex trafficking of Plaintiff Jane Doe via XVideos and XNXX*

188.   Jane Doe was trafficked when she was just fourteen (14) years old.

189.   When she was still a minor, a sex trafficker forced Jane Doe to participate in the creation of videos of adults raping her.



190.   As a minor, Jane Doe's traffickers also sold her for sex and some of the sex acts forced upon Jane Doe were recorded on video and uploaded to the XVideos and XNXX websites.

191.   Jane Doe was not paid for her participation in the production of these videos.

---

[51] *See*, https://www.trafficfactory.com/index.html.

192.  Videos of adults engaging in sex acts with Jane Doe while she was a minor were uploaded and disseminated through websites owned, operated and/or controlled by Defendants, including, but not limited to XVideos and XNXX.

193.  Videos of these sex acts with the minor Jane Doe continued to turn profits as they were reviewed, downloaded, stored, and disseminated.

194.  At least four videos that included Jane Doe being trafficked as a minor have been identified on WGCZ sites.

195.  The names and other features of the videos are likely to jeopardize Jane Doe's anonymity in this proceeding. For Jane Doe's privacy and safety, Plaintiff will be moving for leave to file the names of those videos with the Court under seal.

196.  At least one "content partner" and official "channel" on XVideos and XNXX disseminated these illegal videos of Jane Doe's rape. XVideos and XNXX are in a revenue sharing relationship with this content partner and channel. This XVideos/XNXX "content partner" continues to be a promoted channel on XVideos even after Plaintiff's videos were removed in response to a cease and desist letter sent in Fall 2020 identifying the videos as illegal child sexual abuse material and depictions of Plaintiff's sex trafficking.

197.  XVideos and XNXX maintain a continuous business relationship with this sex trafficking Channel and continues to share profits with it.

198.  Neither XVideos, XNXX, nor any other website, owned or operated by WGCZ Defendants undertook any measure to verify Jane Doe's identity or age. As a result, child sex abuse material ("CSAM") depicting Jane Doe was distributed broadly throughout the world on Defendants' internet websites.

199.  Jane Doe reached out to XVideos and XNXX many times over the years, beginning in at least 2017, requesting her abuse videos be removed. Using the websites' reporting forms, she informed XVideos and XNXX that she was a sex trafficking victim and pleaded with them to remove the videos.

200.   She never received a response from the websites. The videos remained live until her attorneys sent a demand letter on her behalf.

201.   During the time that WGCZ Defendants distributed and advertised the CSAM depicting Jane Doe they profited financially from the videos through the sale of advertising and by drawing users to their websites to view the videos.

202.   Specifically, Defendants financially benefitted from Jane Doe's sex trafficking as each video depicting her abuse accrued thousands of views, with one video accruing over 160,000 views, and advertisements were placed on webpages containing CSAM depicting Jane Doe. This activity garnered substantial traffic to WGCZ websites and provided substantial data and advertising revenue.

203.   Jane Doe continues to be traumatized, every single day, by WGCZ, whose platform is being used to permit the continued and repeated dissemination of these horrific videos for sexual gratification and for profit.

204.   Jane Doe knows that her videos have been downloaded, using the easy-to-find "Download" button that WGCZ placed on its websites.

205.   Jane Doe is at risk that the videos of her abuse will be further disseminated -- even uploaded a second time to a WGCZ platform, under a different name or with different tags, leading to further harm to her.

206.   As described above, WGCZ's moderation practices are inadequate, and the Defendants have frequently permitted the re-uploading of illicit videos.  The broad dissemination of child sex abuse material depicting Jane Doe has severely harmed Jane Doe, including financial, physical, emotional, and reputational harm.

### Jane Doe and Members of the Class Continue to Suffer Irreparable Harm

207.   Class members, including Plaintiff, remain at risk of irreparable harm due to Defendants' failure to enact and enforce appropriate and sufficient policies, procedures, and processes for the prevention of child pornography from being added to the WGCZ Defendants' sites.

208.   On behalf of the Class and herself, Plaintiff seeks injunctive and equitable relief requiring the Defendants to identify and remove child pornography and implement corporate-wide policies and practices to prevent continued dissemination of child pornography or child sex trafficking.

209.   Because of the insidious nature of child sex trafficking and child pornography, all of this relief is necessary to protect the present and future interests of Plaintiff and Class members.

**CAUSES OF ACTION**

**COUNT I**
**BENEFITING FROM A SEX TRAFFICKING VENTURE**
**18 U.S.C. §§ 1591 AND 1595**
*(Plaintiff and the Class Against All Defendants)*

210.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

211.   Plaintiff is a victim of sex trafficking under 18 U.S.C. §§ 1591(a)(2).

212.   Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

213.   Defendants' conduct was in, or affected, interstate and/or foreign commerce.

214.   Defendants knowingly benefited financially or by receiving something of value from participation in a venture which Defendants knew or should have known engaged in an act in violation of the TVPRA.

215.   Defendants developed products and services used to monetize content on their platforms through advertisements and data collection as well as share profits with and make direct payments to child traffickers via Content Partners, and otherwise.

216.   Defendants' ability to monetize their platforms is directly related to the number of users who visit and view content on their platforms.  The number of users

using Defendants' platforms are inherently valuable to Defendants, and directly affects their ability to draw revenue from their platforms and share it with traffickers.

217.  Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in disregard of the fact that the Plaintiff and other Class members were engaged and exploited in commercial sex acts while under the age of eighteen.

218.  Defendants' employees and agents had actual knowledge that they were facilitating and participating in a scheme to profit from the commercial sex acts of minor children.

219.  Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.

220.  Defendants' conduct has caused class members including Plaintiff serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**COUNT II**
**RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY**
**18 U.S.C. § 2252 and 2252A**
*(Plaintiff and the Class against All Defendants)*

221.  Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

222.  Defendants knowingly received, possessed, and distributed child pornography depicting Class members including Plaintiff, violating 18 U.S.C. § 2252 and 2252A.

223.  Defendants also duplicated and distributed new child pornography depicting Plaintiff and Class members by creating and hosting new "thumbnail" images from existing videos of CSAM.

224.  Defendants' receipt and distribution of child pornography occurred in or affected interstate or foreign commerce.

225.   As a proximate result of Defendants' violation of 18 U.S.C. § 2252A, Class members, including Plaintiff, suffered serious harm, including physical, psychological, financial, and reputational harm.

226.   Defendants' conduct was malicious, oppressive, or in reckless disregard of Plaintiff's rights and Class members' rights.   They are entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

**COUNT III**
**RECEIPT AND DISTRIBUTION OF CHILD PORNOGRAPHY**
**18 U.S.C. § 2260**
*(Plaintiff and the Class Against All Defendants)*

227.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

228.   Defendants, at least some of them outside the United States, knowingly received, possessed, and distributed child pornography depicting Class members including Plaintiff, violating 18 U.S.C. § 2260.

229.   At least some of the Defendants' receipt, possession, and distribution of child pornography occurred outside the United States.

230.   As a proximate result of Defendants' violation of 18 U.S.C. § 2260, Class members, including Plaintiff, suffered serious harm, including physical, psychological, financial, and reputational harm.

231.   Defendants' conduct was malicious, oppressive, or in reckless disregard of Plaintiff's rights and Class members' rights.   They are entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2255(a).

///

///

///

///

**COUNT IV**
**DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS,**
**Cal. Civ. Code § 1708.85**
*(Plaintiff and the Class against all Defendants)*

232.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

233.   Defendants have intentionally distributed child pornography.

234.   Plaintiff and the Class did not consent to the online distribution of the videos and images depicting them.

235.   Defendants knew Plaintiff and the Class had a reasonable expectation that the videos depicting them would remain private.

236.   The videos depicted on Defendants' websites exposed intimate body parts of the Plaintiff and the Class.

237.   Plaintiff and the Class were harmed by Defendants' knowing and intentional distribution of child pornography and Defendant's conduct was a substantial factor in causing harm to Plaintiff and the Class.

**CLASS ACTION ALLEGATIONS**

238.   Plaintiff Jane Doe brings this action under to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3) and 23(c)(4), on behalf of themselves and the following "Class":

> All persons, who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A. or (3) engaging in sexually explicit conduct as defined under 18 U.S.C. § 2260, that has been made available for viewing on any website owned or operated by the Defendants.

239.   Plaintiff Jane Doe also brings this action on behalf of:

> All persons residing in California who were under eighteen years of age at the time they were depicted in any video or image, (1) in any commercial sex act as defined under 18 U.S.C. §§ 1591 and 1595, or (2) in any child pornography as defined under 18 U.S.C. § 2252A. or (3) engaging in sexually explicit conduct as defined under 18 U.S.C. § 2260, that has been made available for viewing on any website owned or operated by the Defendants. (the "California Subclass").

240.   Plaintiff reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

241.   <u>Numerosity</u>: The Class consists of thousands of people, making joinder impracticable, satisfying Fed. R. Civ. P. 23(a)(1). The exact Class size and individual Class member identities can only be identified with more certainty with access to Defendants' records.  However, based on the millions of abuse reports made to NCMEC, and Defendants' status as the largest distributor of pornography in the United States, the numerosity requirement can be established.

242.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of the other members of the Class Plaintiff seeks to represent. The Plaintiff's and the other Class members' claims are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' sex trafficking profiteering.  Plaintiff, like all members of the Class, was victimized by Defendants profiting from videos depicting Plaintiff in commercial sex acts or child pornography which Defendants knew, or should have known, were filmed while they were minors.

243.   <u>Commonality</u>: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect only individual Class members, under Fed. R. Civ. P. 23(a)(2).  Additionally, class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.  Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

> a. Whether videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms or servers;
>
> b. Whether Defendants profited from videos depicting minors in commercial sex acts or child pornography appearing on Defendants' platforms or servers;

c.  Whether Defendants' internal controls were inadequate to stop videos depicting minors in commercial sex acts or child pornography from appearing on Defendants' platforms or servers;

d.  Whether Defendants knew or should have known that videos depicting minors in commercial sex acts or child pornography appear on Defendants' platforms or servers;

e.  Whether Defendants' conduct constitutes benefiting from or facilitating sex trafficking, dissemination of videos depicting minors in commercial sex acts or child pornography, or child exploitation in violation of 18 U.S.C. §§ 1591, 1595, and 2252A; and

f.  The scope of the injunctive relief and damages to which the Plaintiff and members of the Class are entitled.

248.  <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests and the interests of all other members of the Class are identical, and Plaintiff is cognizant of her duty and responsibility to the Class. Accordingly, Plaintiff can fairly and adequately represent the interests of the Class. Moreover, Plaintiff's counsel are competent and have a wealth of experience litigating claims regarding sex trafficking and exploitation of minors, complex commercial litigation, and class actions. Plaintiff and counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests. Neither Plaintiff nor their counsel have any interests adverse to those of the other members of the Class.

249.  <u>Equitable relief</u>: Class certification is appropriate under Rule 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief is appropriate with respect to the Class as a whole.  The nature of the relief sought is described in this Complaint.

250. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. Class

treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.  Finally, Class treatment would minimize the trauma that Class members would experience as a result of litigating their claims on an individual basis, and further promotes the remedial purposes of the federal statutes under which the claims are brought.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter a judgment on their behalf and against Defendants, and grant the following relief:

A.   Certify the proposed Class pursuant to the Federal Rules of Civil Procedure Rule 23(a), 23(b)(2), 23(b)(3) and (c)(4);

B.   Designate Plaintiff as representative of the proposed Class and Plaintiff's counsel as counsel for the Class;

C.   Award injunctive or any other equitable relief, to Plaintiff and the Class, requiring the Defendants to identify and remove child pornography and implement corporate-wide policies and practices to prevent continued dissemination of child pornography or child sex trafficking, including:

a.   Content uploaders' accounts should be opened only with bank or credit card information, so that they can be identified.

b.   Government-issued photo identification should be required for each person in a video, and it should be required that each person is at least eighteen years old.

c.   Defendants should use facial recognition technology to verify that each performer in a video or image upload is legal.

d.   Defendants should remove all images and videos of Plaintiff and Class members from their platforms, and archive them for use in this litigation.

e.   Defendants should timely respond to all reports of child pornography, and proactively disable the streaming or downloading of reported videos without a human moderator.

f.   Defendants should disable the "Download" button on videos so that they stop enabling sex traffickers dissemination of videos of Plaintiff and Class Members, causing future harm.

g.   Defendants should send all government IDs that have been associated with any video or account to the databases maintained by States and the United States, including the FBI and the National Center for Missing and Exploited Children, so that sex offenders can be identified and sex-crime victims can be protected.

h.   Defendants should use "video fingerprinting" technology to prevent and remedy the repeat upload of videos of Plaintiff' and Class members' rapes.

i.   Defendants should use human moderators to screen each video and image for child pornography or trafficking of minors before this material is displayed or otherwise disseminated.

j.   Defendants should adequately train individuals tasked with screening videos and images on identifying potential child pornography or trafficking.

k.   Defendants should employ standards for screening for child pornography.

l.   Defendants should promptly terminate any employees who have failed to fairly moderate material.

m.   Defendants should adequately staff their moderation teams tasked with screening videos and images so that all videos are screened in their entirety.

1           n.     Defendants should end the employee bonus program that is based

2                   on the raw number of videos approved per year.

3           o.     Defendants should ban individuals who have uploaded child

4                   pornography or trafficking videos or images from having the ability

5                   to upload anything to a website owned, controlled, or operated by

6                   Defendants ever again.

7           p.     Defendants should limit the number of hours moderators or

8                   employees can review videos and images on a daily basis, so as to

9                   reduce the incidence of "employee burnout" or turnover relating to

10                 the traumatic nature of the work.

11          q.     Defendants should refuse to publish videos and images that have

12                 been flagged or are suspected of containing child pornography or

13                 trafficking.

14          r.     Defendants should immediately send all videos and images with

15                 suspected or confirmed child pornography or trafficking to

16                 NCMEC's clearinghouse, along with all information available to

17                 identify perpetrators or victims.

18     D.     Award all available damages including but not limited to compensatory

19           and punitive damages in favor of Plaintiff and the Class; and

20     E.     Award Plaintiff and the Class prejudgment interest, costs and attorneys'

21           fees;

22     F.     Require restitution and disgorgement of all profits and unjust enrichment

23           obtained as a result of Defendants' unlawful conduct; and

24     G.     Retain jurisdiction of this matter to ensure all forms of relief it deems

25 appropriate.

26 ///

27 ///

28 ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 13, 2021                    Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**


By:   /s/ Abbas Kazerounian
Abbas Kazerounian, Esq.
Mona Amini, Esq.
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626

Telephone: (800) 400-6808
Facsimile:  (800) 520-5523
ak@kazlg.com
mona@kazlg.com

Gregory Zarzaur (ASB-0759-E45Z)*
THE ZARZAUR LAW FIRM
2332 Second Avenue North
Birmingham, Alabama 35203
T: (205) 983-7985
E: gregory@zarzaur.com
*pro hac vice

Kimberly Lambert Adams*
Kathryn L. Avila*
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7056
E: kadams@levinlaw.com
   kavila@levinlaw.com
*pro hac vice

Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
NATIONAL CENTER ON SEXUAL
EXPLOITATION
1201 F Street NW, Suite 200
Washington, D.C. 20004
T: (202) 393-7245
E: lawcenter@ncose.com
*pro hac vice

1    Brian Kent*
     Gaetano D. Andrea*
2    Jill P. Roth*
     M. Stewart Ryan*
3    Alexandria MacMaster*
     LAFFEY, BUCCI & KENT, LLP
4    1100 Ludlow Street, Suite 300
     Philadelphia, PA 19107
5    T: (215) 399-9255
     E: bkent@lbk-law.com
6    gdandrea@lbk-law.com
     jroth@lbk-law.com
7    sryan@lbk-law.com
     amacmaster@lbk-law.com
8    *pro hac vice*

9    Kevin Dooley Kent*
     Mark B. Schoeller*
10   Joseph W. Jesiolowski*
     CONRAD O'BRIEN PC
11   Centre Square West Tower
     1500 Market Street, Suite 3900
12   Philadelphia, PA 19102-2100
     T: (215) 864-9600
13   kkent@conradobrien.com
     mschoeller@conradobrein.com
14   jjesiolowski@conradobrien.com
     *pro hac vice*
15
     Louis C. Bechtle*
16   Of Counsel
     CONRAD O'BRIEN PC
17   Centre Square West Tower
     1500 Market Street, Suite 3900
18   Philadelphia, PA 19102-2100
     T: (215) 864-9600
19    lbechtle@conradobrien.com
     *pro hac vice*
20
     Joshua P. Hayes*
21   PRINCE GLOVER HAYES
     701 Rice Mine Road
22   Tuscaloosa, Alabama 35406
     T: (205) 345-1234
23   E: jhayes@princelaw.net
     *pro hac vice*
24
     *Counsel for Plaintiff and the putative Class*
25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I am a resident of the State of California, over the age of eighteen years, and not
a party to the within action.  My business address is Kazerouni Law Group, APC, 245
Fischer Avenue, Unit D1, Costa Mesa, CA 92626.  On September 13, 2021, I served
the within document(s):

4

5        • **PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

6

7        ☒      CM/ECF - by transmitting electronically the document(s) listed above to
the electronic case filing system on this date before 11:59 p.m.   The
Court's CM/ECF system sends an e-mail notification of the filing to the
parties and counsel of record who are registered with the Court's CM/ECF
system.

8

9

10

11        I declare under penalty of perjury under the laws of the State of California that
the above is true and correct.  Executed on September 13, 2021, at Costa Mesa,
California.

12

13

14                                                /s/ Abbas Kazerounian
15                                                ABBAS KAZEROUNIAN, ESQ.
16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT